WALKER ᴇᴛ ᴀʟ. *v.* ASSOCIATED DRY GOODS
CORPORATION

[No. 170, September Term, 1962.]

(Two Appeals In One Record)

*Decided March 22, 1963.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, HORNEY and SYBERT, JJ.

*Norwood B. Orrick* and *Roger B. Williams,* with whom was *Roger A. Clapp* on the brief, for appellants.

*Robert C. Prem,* with whom were *Hilary W. Gans* and *Niles, Barton, Gans and Markell* on the brief, for appellee.

BRUNE, C. J., delivered the opinion of the Court.

This case involves the interpretation of a lease of a shopping center and a modification thereof. The lease provides for a fixed rental and for "additional rent" to be paid by the lessee based upon a scale of percentages of "net sales" above a minimum figure. The controversy is whether or not the net sales of the sub-tenants of four shops are to be included in computing the additional rent. The Chancellor held that they were not, and the lessors appeal.

Negotiations extended over several years prior to the execution of the original lease (referred to below as "the lease"),

which is dated December 1, 1952. The lessor, called "Landlord" in the lease, was Drumcastle, Inc., a corporation of which Amelia H. Walker, Talbott H. Walker, M. Cooper Walker and Katherine W. W. Sanger were the only stockholders. On December 2, 1952, Drumcastle, Inc., assigned its interest in the lease in equal shares to its four stockholders as individuals. Talbott H. Walker died in April, 1957. The First National Bank of Baltimore and Nicholas G. Penniman, III, qualified as executors and are now trustees under his will, and as such they now hold a one-fourth undivided interest in the lease. (The assignees of the lease, including since the death of Talbott H. Walker the above-named trustees, are sometimes collectively referred to below as "the Walkers.") The original lessee, called "Tenant" in the lease, was Associated Dry Goods Corporation ("Associated"), which operates a division in the Baltimore area known as "Stewart & Co." The particular store here involved is located on the east side of the York Road in Baltimore County, but the entire shopping area tract consists of about 9.3 acres, of which roughly 7.2 acres are in Baltimore County and 2.1 in Baltimore City.

Other agreements having some bearing on the controversy include: an agreement dated September 24, 1953, between the Walkers and Associated as parties of the first part and a group of neighborhood or improvement associations, incorporating as a part thereof a revised site plat attached thereto; and an agreement modifying the lease, dated April 13, 1954, between the Walkers, Associated and Stewart & Co. Limited. (There was a further modification of provisions of the lease with regard to a restaurant and other property retained by the Walkers on which there was a restaurant, but it has no direct relevance here.) The appellee also offered in evidence two other documents which were admitted over the objection of the appellants. The first of these was a letter dated April 17, 1952, from Mr. Lewis P. Seiler, then President of Stewart & Co., to Mr. James W. Rouse, of Moss-Rouse Company, real estate agents for the Walkers. This letter outlined proposed terms of a lease. The second was a letter in reply, dated April 21, 1952, from Mr. Rouse to Mr. Seiler, agreeing to some of the suggested terms and proposing changes with regard to others.

The lease as finally drafted is a rather elaborate document covering twenty-four pages in the printed record extract. It is divided into twenty-two Articles, each with its own heading, and some Articles contain several Sections. Each Section is numbered first, according to the Article in which it is contained, and then serially according to its position in that Article, the first Section in each Article being designated as ".01", the second as ".02", and so on. Section 1.01, *inter alia,* describes the demised premises, Section 2.01 fixes the term of the lease as 32 years and 2 months, Section 15.01 provides for 6 renewal periods of 10 years each, and Article Sixteen deals with the tenant's option to purchase, which is exercisable on specified notice prior to the expiration of the original term or of any renewal term.

Article Three is entitled "Construction of Store Building." Section 3.01 provides in part:

> "The Tenant agrees to construct upon the leased premises * * * a building (hereinafter called the store building) suitable for use for the sale of goods, wares and merchandise at retail, which shall contain not less than 66,000 square feet of selling area."

Then follow provisions as to how selling area is to be determined. Section 3.02 provided that this building be completed by April 1, 1955. The building went into operation on February 8, 1955.

Article Four deals with rent. Section 4.01 establishes fixed rentals for certain periods, and there is no controversy with regard thereto. Section 4.02 provides for the payment of "additional annual rent" measured by the amount, if any, by which a percentage rental computed on a basis therein stated exceeds the fixed rental for the same period. The basis is 5/10ths of 1% on the first $6,000,000 of annual net sales, 4/10ths of 1% on the next $1,000,000 of such sales, 3/10ths of 1% on the next $1,000,000 and 2/10ths of 1% on all annual net sales in excess of $8,000,000.

Section 4.03 first provides that "[f]or the purposes of calculating percentage rental the term 'annual net sales' shall mean gross sales included in 'gross sales,' as hereinafter provided, less

discounts, returns and allowed claims." It then provides, *inter alia*: (a) that "[s]ales made by the Tenant at or from the leased premises shall be included in 'gross sales;'" (b) that "[s]ales made by persons other than the Tenant at or from buildings other than the store building erected as provided in AR-TICLE THREE hereof shall not be included in 'gross sales;'" (c) that "[r]etail sales made at or from the said store building by any person or corporation whatever shall be included in 'gross sales,'" subject, however, to the proviso that if, after the "store building" shall have been completed, it is later expanded by adding additional selling area, sales made by any person other than the Tenant in or from such additional selling area shall be excluded from "gross sales;" (d) that sales by any person other than the Tenant from a retail establishment partly within the "store building" as completed in accordance with Article Three and partly within an "additional selling area" or another building on the leased premises shall be prorated according to the respective areas; and (e) that all sales made by an affiliate of the Tenant or by any subtenant or licensee whose operations are conducted as a part of the Tenant's retail business shall be treated as sales made by the Tenant.

Article Five is entitled "Tenant's Operation of Store Building." Section 5.01 required the Tenant to operate a retail business in the "store building" for seven and a half years after its completion. During that period it forbade the Tenant's reducing the selling area devoted to such operations below 66,000 square feet and the Tenant's "by voluntary action substitut[ing] any other person or corporation as the occupant or tenant of the said building or as the operator of the retail business to be conducted therein * * *." The latter prohibition was not to apply to concessions or to licenses to others to conduct departments operated as part of the Tenant's retail business. Section 5.02 authorizes the Tenant after the 7½ year period to restrict or discontinue its retail operations and to sublet to others all or any part of the "store building." Section 5.03 gives the Landlord an option, subject to certain conditions, to require the Tenant to purchase the leased property if it reduces or discontinues operations pursuant to Section 5.02.

Under Article VI, entitled "Alterations, Improvements and New Construction", the Tenant has the right to erect or to permit others to erect other buildings on the leased premises, and no additional "fixed rent" or "additional annual rent" is payable in respect thereof. The Tenant also has the right to make alterations, changes or improvements in or to the "store building" and other buildings; and "except as provided in Section 5.01 * * * may demolish all or any part of any such building."

Article Seventeen is entitled "Assignment, Mortgage and Sub-Leases." Section 17.01 permits the Landlord to convey and otherwise dispose of the demised premises and its interests under the lease at any time. This power was exercised the day after the lease was executed by its assignment of the lease to Drumcastle's stockholders. Section 17.03 authorized the Tenant to "sublet the premises or any part thereof, subject only to its obligation to construct a retail store with not less than 66,000 square feet of selling space, as set forth in ARTICLE THREE hereof and to operate said store as set forth in ARTICLE FIVE hereof."

The next document in point of time is the agreement of September 24, 1953, between the Walkers, Associated, and several neighborhood or improvement associations revising the general shopping center plan previously agreed upon between the Walkers and the associations. It is relevant to the present controversy only because of the plat attached thereto. This plat shows two separate proposed structures. The northern structure is shown as containing a large area marked "Stewart's" and, at its southern end, a group of three stores designated as "A Shops." (The fourth shop involved in this controversy is not shown on this plat and was apparently added to the plan at some later stage prior to the completion of the original building.) The southern structure, as shown on this plat, contains what are designated as "B Shops" (rather vaguely delineated) and "C Store." Each of the two principal structures is outlined by a relatively heavy black line. The "A Shops" are marked off by light interior lines; and the same is true as to the "B Shops" and the "C Store" in the southern structure.

The agreement dated April 13, 1954, between the Walkers, Associated, and Stewart & Co. Limited (called the "Realty Company") amends the lease. This agreement recites, *inter alia*: (a) the assignment of the lease by Drumcastle, Inc., to the Walkers (called in this agreement the "Owners"); (b) the desire of Associated to assign its rights under the lease to its wholly owned subsidiary, the Realty Company, so that the latter "may erect and finance the building or buildings to be erected on the leased premises in accordance with the terms of [the] lease;" (c) that "the Realty Company proposes to sublease the premises to Associated for purposes of operation;" and (d) that "Associated and the Realty Company have requested the Owners to consent to the assignment of said lease and the sublease to Associated." By the first three operative provisions of the agreement, (1) Associated agreed to assign its interest under the lease to the Realty Company; (2) the Realty Company agreed to sublease the premises to Associated for purposes of operation; and (3) Associated agreed "that it will not be relieved of any of its obligations under [the] lease by reason of its assignment thereof to Realty Company." The fourth operative provision reads as follows:

"4. The parties hereto agree that wherever in said lease operation of a store building by the Tenant is referred to, such reference shall be taken to mean operation by Associated whether as tenant or subtenant, and that the percentage rental provided for by Article Four of said lease shall be based upon the sales of Associated whether as tenant or subtenant of said premises."

Under the fifth operative clause it was agreed that any options granted to the Tenant under the lease might be exercised "either by the Realty Company as Tenant or by Associated either as tenant or subtenant." Finally, by the sixth operative clause, the Walkers consented to the assignment of the lease by Associated to the Realty Company and to the sublease by the Realty Company to Associated "on the terms and conditions hereinbefore set forth."

At the trial the appellants presented the testimony of an architect who had been employed in the construction of the shopping center to the effect that the northern structure constituted only one building. He testified that the "A Shops" were separated from the Stewart's area and from each other by cinder block partition walls one story high, which were not weight-bearing walls, that though these stores had separate heating, ventilating and air-conditioning controls, the heating and air-conditioning and the sprinklers therein were all parts of central systems serving the entire structure, and that all of the "A Shops" and the Stewart's store were under a single roof. The evidence also showed that Stewart's occupied, in addition to the greater part of the ground floor area of this structure, the whole of the second floor, including the portion above the "A Shops." It was stated that as originally constructed, the "A Shops" and one other occupied 10,000 square feet, that Stewart's "selling area" in this building amounted to 78,000 square feet (12,000 square feet more than the required minimum of 66,000), and that Stewart's "selling area" had been subsequently increased to 96,000 square feet.

Associated accounted to the Walkers for additional rent based on sales for each of its fiscal years, which ended in January, from 1956 through 1962. None of these accountings included any rent based upon sales made by tenants of any of the "A Shops," and no claim to any such rent was asserted by the Walkers until late in 1959 or early in 1960, when such a claim was asserted by Mr. Penniman, who by then had become a trustee under the will of Talbott H. Walker. On one previous occasion, one phase of Associated's accounting had been reviewed by the Walkers' certified public accountant in accordance with a provision of the lease, but this review had nothing to do with sales by tenants of the "A Shops." The Walkers were aware of the existence of these stores.

The appellants found their claim upon Section 3.01 requiring Associated to conduct the "store building" of not less than 66,000 square feet of selling space and upon Section 4.03 providing for the payment of additional rent based upon sales made in or from the "store building." The appellee contends that

the provisions of the sections relied upon by the appellants when read in conjunction with other provisions of the lease and the amending agreement show that only sales by Associated (or by its concessionaires or licensees) were to be taken into account in determining the percentage rent.

The appellee maintains that 66,000 square feet was the "magic figure to produce the desired minimum rent return," that the provisions of Section 4.03 for the inclusion of sales made by persons other than the Tenant at or from the store building in the rent base was solely because of the escape clause provisions of Section 5.02 allowing Associated to reduce its selling area after seven and a half years below the magic figure of 66,000 square feet, and that the clause in the amending agreement clearly limits, and confirms that the original lease limits, sales at and from the store building to be taken into account to sales made by Associated. They also seek to support this construction by reference to the prior negotiations of the parties, the site plan agreed upon in 1953 and the practical construction placed upon the agreement for the first several years in which rent based upon a percentage of sales was paid. They contend that even if the agreements between the parties were not entirely clear, they were at least ambiguous, so as to render parol evidence admissible as to their construction.

The amending agreement of April 13, 1954, does not, in our view, change or purport to change the rent provisions of the lease beyond the evident and expressed purpose of the agreement. This was to substitute the so-called Realty Company as the holder of the long term lease (which, with renewals, could extend for over 94 years) so as to make it in effect the "title holder" of the lease and to permit it to undertake the construction and financing of the shopping center, without, however, changing the operating control and without releasing Associated from any of its obligations under the lease by reason of its becoming a subtenant, instead of the direct tenant under the lease. These obligations were expressly confirmed and retained. We find nothing to show any intention either to modify or to construe the meaning of the term "store building" and the express provisions of Section 4.03 for the payment of rent

based upon sales at or from the store building by persons other than Associated.

We are also unable to read the lease as showing that those provisions of Section 4.03 are operative only if and when Associated may cease to use and occupy as much as 66,000 square feet of selling space in the store building. There is not one word in that portion of that section to indicate to us that it is to have any different meaning or effect before or after the expiration of the seven and a half year period or when Associated uses more or less than 66,000 square feet. The lease might have contained such provisions, but it does not. Associated was obligated to have not less than that amount of selling space in the store building. It elected to build more. It might have protected itself against liability for rent based on the sales of others in the store building so long as Associated maintained the "magic figure" of selling area in that building, but it did not do so.

The obligation of Associated under Section 3.01, the pertinent portion of which we have quoted, was to build *a* building containing not less than 66,000 square feet of selling area. This building is designated by a parenthetical clause in that section as "the store building," and it is so referred to throughout subsequent provisions of the lease. This designation does not even purport to restrict the meaning of the term "a building," and there is nothing to limit the meaning of the term *"a* building" to "that *portion of a* building occupied by Associated (or Stewart & Co.)." The evidence, we think, establishes that the entire northern building as originally constructed constituted one building.

We turn next to Section 4.03 dealing with both fixed rentals and additional rentals based upon percentages of sales. We first note that insofar as sales by Associated are concerned, it makes no difference whether Associated sells from the "store building" as originally constructed or as enlarged or from any other part of this shopping center. All of its sales from whatever part of the leased premises are included. Equally, clearly and explicitly sales by persons or corporations other than Associated, made at or from any part of the leased premises not

included in the "store building" do not serve to increase the fixed rent under the lease nor do they serve as a basis for "additional annual rent" based on a percentage of net sales.

Under Section 4.03 sales at or from the "store building" as originally built or as it may later be enlarged which are or are not to serve as the basis for determining net sales upon which additional rent is to be calculated are dealt with at some length and, we think, quite definitely. First, the general rule is stated that "[r]etail sales made at or from the said store building by any person or corporation whatever shall be included in 'gross sales.'" Then follows a proviso excluding from gross sales any sales by others than Associated at or from any additions which may be made to the original "store building." This in turn is followed by a provision for apportionment of sales made by others from premises partly within the original store building and partly within either an addition thereto or some other building on the leased premises. This apportionment is based upon selling areas in different categories, and such sales by others as are thus apportioned to the original "store building" are expressly included in "gross sales." In addition there are the provisions of Section 17.03 which permit subleases by Associated of any part of the demised premises, subject only to its obligations under Article Three to construct, and under Article Five to maintain for seven and a half years, not less than 66,000 square feet of selling area for its own use in the "store building." These provisions, in our opinion, render wholly untenable Associated's contention that only its own sales (including those of its affiliates, licensees or concessionaires) from the "store building" were to be taken into account in determining additional rent based on percentages of net sales under the terms of the original lease. We have already stated our view that the amendment of April 13, 1954, substituting Associated as subtenant for Associated as original tenant did not amend other provisions of the original lease.

Where, as here, the court finds no ambiguity in the pertinent language of the contract, there is no occasion to resort to outside aids to its construction. *Slice v. Carozza Properties, Inc.,* 215 Md. 357, 368, 137 A. 2d 687; *Ray v. Eurice,* 201 Md. 115,

93 A. 2d 272. See also like statements of the rule in *National Union Mortgage Corporation v. Potomac Consolidated Debenture Corporation,* 178 Md. 658, at 673, 16 A. 2d 866, and in *Buffalo Pressed Steel Co. v. Kirwan,* 138 Md. 60, at 66, 113 A. 628, at 630. In the instant case, we think that the evidence established the identity and singleness of the original "store building," and that the provisions of the lease applicable thereto relating to rent based upon percentages of sales made (or deemed to have been made under the apportionment formula) at or from the "store building" by persons other than Associated are clear and free from ambiguity. We accordingly hold that parol evidence of intention was not admissible to vary the terms of the written contract. See, among comparatively recent cases, *Weber v. Crown Central Petroleum Corporation,* 214 Md. 115, 132 A. 2d 857; *Born v. Stancills, Inc.,* 214 Md. 443, 135 A. 2d 843. We might add that we should find the evidence as to prior negotiations offered by the appellee far from clear as to the construction of the contract, if it were properly admissible.

The appellee's contentions with regard to the practical construction of the contract by the parties encounter similar difficulties insofar as the absence of ambiguity is concerned. Where there is an ambiguity, practical construction is of great importance and in other cases it may even amount to evidence of an amendment of the agreement. See *Saul v. McIntyre,* 190 Md. 31, 36, 57 A. 2d 272; *Evergreen Amusement Corporation v. Milstead,* 206 Md. 610, 112 A. 2d 901; *Solomon's Marina, Inc. v. Rogers,* 221 Md. 194, 198, 156 A. 2d 432. However, only where there is an ambiguity in the contract is the conduct of the parties available as a practical construction of its meaning. *Product Sales Company v. Guaranty Company of Maryland,* 146 Md. 678, 127 A. 409; *U. S. Naval Academy Alumni Association v. The American Publishing Company,* 195 Md. 150, 156-57, 72 A. 2d 735 (where this rule was clearly stated, but the appellant's proof of items in respect of which it sought to apply the rule was insufficient); *Restatement, Contracts,* § 235 (e), comment *h.*

The other situation in which the conduct of the parties may

have controlling effect exists where their conduct may amount to a modification of the agreement. Here, as in the *U. S. Naval Academy Alumni* case, *supra,* we think the evidence does not support an inference of modification of the contract. (We have already held that the amending agreement of April 13, 1954, did not amend the terms here pertinent.) The mere acceptance by the Walkers for several years of payments in less amounts than they were entitled to under the lease does not evidence an intention on their part to modify the terms of the lease. See the *Product Sales Co.* case, *supra,* and compare *Baltimore & Annapolis Railroad Company v. Carolina Coach Company,* 206 Md. 237, 111 A. 2d 464, in which a payor was held entitled to recover payments mistakenly (and concededly mistakenly) made under a lease.

In accordance with the views above expressed the decree will be reversed and the case remanded for the entry of a decree in conformity with this opinion (1) to the effect that sales from all stores within the original "store building" are to be included in "gross sales" to be used in determining net sales upon which additional rent based upon percentages of sales is to be calculated, subject to the formula contained in the lease where sales by any subtenant are made in part at or from the original "store building" and in part at or from any addition thereto; and (2) for an accounting.

> *Decree reversed and case remanded for further proceedings in accordance with this opinion; the costs to be paid by the appellee.*