FOOD FAIR STORES, INC., ET AL. *v.* BLUMBERG, ET AL.

[No. 303, September Term, 1963.]

522

*Decided May 4, 1964.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, MARBURY and SYBERT, JJ.

*Albert L. Sklar* and *William J. Pittler,* with whom were *Sklar & Sullivan* on the brief, for appellants.

*Wilfred T. McQuaid* for appellees.

PRESCOTT, J., delivered the opinion of the Court.

This action involves the construction of a percentage lease contract. The lessor-appellees filed suit against the lessee-appellants, praying *inter alia,* a termination of the agreements between the parties and damages for the breach of an alleged im-

plied covenant and certain express provisions in the agreements. The lessees filed a combined demurrer and answer, and also a cross-claim, seeking the specific performance of an option to renew the aforesaid agreements. The demurrer was sustained by Judge Cullen as to the paragraphs which alleged the breach of an implied covenant that lessees would "use their best efforts to derive the maximum volume of business from plaintiffs' store." Lessors have appealed this action by Judge Cullen. The case was tried by Judge Jones, who granted lessees specific per-formance of their option to renew, and awarded the lessors $28,234.03 damages. The lessees appeal from that portion of the decree which awards the lessors damages.

Three questions are presented for our determination:

1. Do the assignments of April 30, 1956, from Food Fair Stores of Maryland, Inc. to Food Fair Stores, Inc. and from Food Fair Stores, Inc. to Food Fair Stores, Anne Arundel, Inc., fall within the purview of paragraph 12 of the main lease agreement?

2. Assuming, *arguendo*, that the assignments were of the type contemplated by paragraph 12 of the lease agreement, do the acts and conduct of the parties evidence a modification of said paragraph 12, or, in the alternative, have the lessors waived their right to the additional rental, or, in the further alterna-tive, are the lessors estopped to assert their alleged claim for additional rental?

3. Do the allegations contained in the bill of complaint as amplified by the lease agreements establish the existence of an implied covenant on the part of the lessees to use their best efforts to derive the maximum volume of business from les-sors' store?

On December 7, 1949, the appellees (hereafter, we sometimes refer to the lessors as "appellees") entered into a lease with Food Fair Stores, Inc., a Pennsylvania corporation, one of the appellants (hereafter, we sometimes refer to the lessees as "ap-pellants") herein, wherein said appellant agreed to lease from the appellees a store building, in Glen Burnie, Maryland, which store building was to be built by the appellees in accordance with specifications furnished by Food Fair Stores, Inc. In ad-dition to the store building, the lease covered approximately

30,000 square feet of land, contiguous thereto, which was to be used by the tenant for customer parking. On July 11, 1950, the lease agreement was amended, and on June 30, 1951, the lease, as amended, was assigned from Food Fair Stores, Inc., to Food Fair Stores of Maryland, Inc., a wholly-owned subsidiary corporation. The assignee, Food Fair Stores of Maryland, Inc., took possession of the premises on July 1, 1951, and began conducting the business of a retail food supermarket on July 10, 1951.

On October 19, 1951, the appellees entered into an additional lease agreement with Food Fair Stores of Maryland, Inc., covering two lots of ground contiguous to the aforesaid leased premises for additional parking and on February 15, 1954, a further agreement was entered into by and between the appellees and Food Fair Stores of Maryland, Inc., permitting Food Fair Stores of Maryland, Inc., to build an addition of some 2,600 square feet to the original store building.

The relevant paragraphs of the lease agreement, dated December 7, 1949, in pertinent part, are as follows:

"4. Tenant agrees to pay, and Landlord agrees to accept, as rental for each lease year (as hereinafter defined) of this lease an amount equal to one (1%) per cent of the gross sales (as hereinafter defined) made in Demised Premises in each such lease year, up to, but not exceeding Two Million ($2,000,000) Dollars; provided, however, that for and with respect to each full lease year, Tenant shall pay a minimum annual rental of Ten Thousand Five Hundred and Sixty ($10,560.00) Dollars.

"Said rental shall be payable as follows: * * *.

* * *

"12. Tenant may assign this lease or sublet the Demised Premises or any portion thereof to be used for any lawful purpose whatsoever subject to the provisions of Paragraph 10 hereof. In the event that such assignment or subletting is for Supermarket Purposes (as defined in Paragraph 10 hereof) Tenant shall be released and relieved of and from all liability for the

payment of any rental measured against a percentage of sales as hereinabove provided in Paragraph 4 hereof, and Tenant's only obligation with respect to rental shall be the payment of the annual rental of the greater of *either* Thirteen Thousand Two Hundred Dollars ($13,200) *or* the average annual rental theretofore paid by Tenant hereunder for the preceding ten (10) years or such shorter period as this lease shall then have been in effect, payable in equal monthly installments in advance; provided, however, that the assignee or sublessee, as the case may be, shall, in writing, assume and agree to keep, perform and preserve all the terms, covenants and conditions of this agreement on the part of Tenant to be kept, performed and preserved, * * *."

"5. There is added to paragraph 12, at the end thereof, the following language: 'Tenant agrees, in the event of an assignment, to immediately furnish Landlord and the mortgagee of the demised premises, with an executed copy of the instrument of assignment * * * and Tenant further agrees that it will obtain for Landlord and mortgagee a like agreement from any such assignee in case of further assignment.' "

In June of 1951, prior to the opening of the Glen Burnie supermarket, the Food Fair organization decided that it would be in the best interests of the chain to form a wholly-owned subsidiary corporation to take over and operate the various stores located in the State of Maryland. Accordingly, Food Fair Stores of Maryland, Inc. was incorporated and on June 30, 1951, the main lease was assigned from the parent, Food Fair Stores, Inc., to the newly-formed and wholly-owned subsidiary. The appellees were notified of the assignment in October of 1951, but they did not make formal demand that they be paid rental as provided in paragraph 12 of the main lease.

Again, in April of 1956, Food Fair Stores, Inc. determined that its corporate subsidiary structure was becoming obsolete, and, accordingly, another corporate reorganization plan was put into effect. In order to effectuate the new reorganization

plan, Articles of Incorporation of Food Fair Stores, Anne Arundel, Inc. were prepared and filed, and, on April 30, 1956, the leases of December 7, 1949, and October 19, 1951, were assigned from Food Fair Stores of Maryland, Inc. to the parent corporation, Food Fair Stores, Inc., and then from Food Fair Stores, Inc. to Food Fair Stores, Anne Arundel, Inc. the newly-formed and wholly-owned subsidiary. Food Fair Stores of Maryland, Inc. was then formally dissolved. Appellees were never notified of these assignments, but were furnished copies thereof in July, 1960, at the request of the lessors, after Mr. Feldman noticed that the percentage rental check was signed by Food Fair Stores, Anne Arundel, Inc.

Beginning on October 4, 1951, and continuing through April 10, 1958, the quarterly certified statement of sales was reported to the appellees on the letterhead of Food Fair Stores, Inc. and signed by Food Fair Stores, Inc. Subsequent thereto, the statements, although on the letterhead of Food Fair Stores, Inc., were signed "Food Fair Stores, Inc.—Agent."

All minimum rental checks were paid by checks of Food Fair Stores, Inc., and all percentage rental checks from 1951 through June of 1956 were paid by checks of Food Fair Stores of Maryland, Inc., which were yellow in color and the percentage rental checks received by the appellees, from July 9, 1956, through July 7, 1960, being twelve in number, were paid on orange-colored checks of Food Fair Stores, Anne Arundel, Inc.

Appellees received the maximum rental of $20,000 per year, payable under the terms of the main lease agreement, from the time the store was opened in July of 1951 through the lease year ending June 30, 1959, but thereafter, if appellees were entitled to rental as provided in paragraph 12, due to decreased sales, they received $25,355.54 less than they should have, which with interest added, constituted the $28,234.03 damages allowed by the court below.

I

The lessees first contend that the assignments of April 30, 1956, were merely "technical," "purported," or "intra-company" assignments and "do not fall within the purview of paragraph 12 of the lease agreement." They seek to invoke the doctrine of

"practical interpretation," or "practical construction" of the terms of a contract, whereby, under certain circumstances, assistance in construing a contract may be obtained from the statements or conduct of the parties. *Walker v. Ass. Dry Goods Corp.*, 231 Md. 168, and cases therein cited; Corbin, *Contracts,* § 558. They claim that the lessors "have arbitrarily either recognized or disregarded the subsidiary assignee corporations whenever one policy or the other best suited their interests," and that the actions and conduct of the lessors and the testimony of William Taft Feldman show the assignments were not within the contemplation of paragraph 12. However, they concede, as indeed they must, that "the practical construction of an agreement as evidenced by the acts and conduct of the parties is only available in the event of an ambiguity, *Walker v. Ass. Dry Goods Corp.*, 231 Md. 168." Judge Jones, in her opinion, stated: "In the present case the provisions of paragraph 12 of the main lease * * * are as clear and free from ambiguity as they could possibly be. No outside aids, including the doctrine of 'practical interpretation' are required. Defendants' contention that since there were only 'technical assignments' within the Food Fair family is not tenable, for a subsidiary corporation, for whatever purpose it may exist, is a separate corporate entity, even though all its stock may be owned by another corporation. 13 Am. Jur., *Corporations,* pp. 159-160; 64 A.L.R. 2d 769; *Brune, Maryland Corporation Law & Practice* (Rev. Ed.), §§ 371-373." We agree. The main lease was prepared by the parent corporation, and if it desired to except assignments to wholly-owned subsidiaries from the provisions of paragraph 12, it could easily have done so, but this it failed to do. Cf. *Walker v. Ass. Dry Goods Corp., supra.* We hold that the provisions of paragraph 12 applied to the assignments of the main lease to the wholly-owned subsidiaries.

## II

The lessees' assignment of error under this heading is trifurcated. Here they argue that the acts and conduct of the lessors evidenced a modification of paragraph 12, constituted a waiver of their right to additional rental, and/or estopped them from asserting any claim therefor. Specifically, they contend that

the failure of the lessors formally to demand payment under the provisions of paragraph 12 after learning, in October of 1951, of the assignment of June 30, 1951, was such conduct as to amount to a modification of the agreement, or a waiver of their right to collect rental under paragraph 12; and, since the assignments in 1960 were made in reliance upon the acquiescence of the lessors to the "prior technical assignment," the lessors are now estopped from asserting any claim for additional rental.

We are unable to conclude that the course of conduct pursued by the lessors was such as to amount to a modification of the agreement. When they learned, in October 1951, of the original assignment of June 30, 1951, the situation was entirely different than it was in 1960, when the lessors learned of the assignments of 1956. As of June 30, 1951, the store had not opened (July 10, 1951, being the opening date); hence there was no basis upon which to compute the possible future rental as provided by the provision of paragraph 12 of "the average annual rental theretofore paid * * * for the preceding ten (10) years or such shorter period as this lease shall then have been in effect * * *." In addition, lessors had received a report of the sales for the first quarter of over $600,000, which indicated that they would receive during the course of the year the maximum rental provided for in the main lease (and it turned out that they did). During the full period of occupancy by Food Fair Stores of Maryland, Inc., the landlords received the maximum rental, $20,000, each year. Consequently, in April 1956, when the new assignments were made, $20,000, by virtue of paragraph 12, had become the minimum guaranteed rental. And it must be remembered that the lessors did not learn of these assignments until some four years later. The sending of different colored rental checks drawn on Food Fair Stores of Maryland, Inc., and Food Fair Stores, Anne Arundel, Inc., and the signing of the statements Food Fair Stores, Inc. — Agent did not constitute notice of the assignments, as provided by the clear terms of the lease. The above circumstances are insufficient, we think, to warrant an inference of a modification of the clear terms of the contract.

The principles involved herein are quite similar to those in-

volved in *Walker v. Assoc. Dry Goods Corp., supra.* There, we held that the acceptance for several years by the landlord of lesser rental payments than those due did not prevent the landlord from collecting rent in accordance with the clear terms of the contract. See also *Product Sales Co. v. Guaranty Co.,* 146 Md. 678, where the Court of Appeals held that "the submission of the defendant to erroneous exactions in the course of the previous accounting [a long series of settlements] should not control our decision as to the meaning and effect of the contract [whose terms were clear and unambiguous] * * *." And compare *U. S. Naval Academy v. Amer. Publ. Co.,* 195 Md. 150, and the cases therein cited.

We proceed to a consideration of the claims of waiver and estoppel. Waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances. *Gould v. Transamerican Associates,* 224 Md. 285. And acts relied upon as constituting a waiver of the provisions of a contract must be inconsistent with an intention to insist upon enforcing such provisions. *Maryland Casualty Co. v. East Balt. Driving Ass'n,* 135 Md. 105.

The only conduct relied upon as constituting a waiver is that the lessors did not formally demand payment under paragraph 12 after they were notified in October, 1951, of the first assignment, and thereafter accepted percentage rental checks drawn by the subsidiary corporations. The claim, we think, is rather tenuous. We pointed out above the difference in the situations of 1951 and 1956. Had the lessors demanded payment under paragraph 12 in October of 1951, they would immediately have made $13,200 the maximum as well as the minimum future rental, for at that time there was no "average annual rental theretofore paid by tenant" upon which to base the maximum rental called for in paragraph 12, and if thereafter paid under the provisions of paragraph 12, there never would have been. Such a result was clearly not anticipated by any of the parties. When the lessors learned in 1960 of the assignments of 1956, they promptly demanded payment in accordance with paragraph 12, and the decree entered below is based upon rental for

the year ending in June, 1960, through part of the month of July 1963. We do not think the conduct of the lessors was inconsistent with an intention to assert their rights under paragraph 12, or that it would justify an inference that they had relinquished such rights. Cf. *Walker v. Ass. Dry Goods Corp., supra; B. & A. R. R. Co. v. Carolina Coach Co.,* 206 Md. 237. We held above that the sending and acceptance of the different colored checks and the signing of some of the statements as "agent" did not constitute notice of the assignments as required by the lease, and we now hold that they were insufficient to constitute a waiver of the provisions of paragraph 12.

Appellants finally contend that the same conduct estopped the lessors from claiming rental under paragraph 12. The answer thereto need not be long. An essential element of estoppel is that the person sought to be estopped must be guilty of some wrongful or unconscientious conduct, on which the other party has relied and been misled to his injury. *Gould v. Transamerican Associates, supra; Fitch v. Double "U" Sales Corp.,* 212 Md. 324; *Benson v. Broden,* 174 Md. 202. Appellants say they made the assignments in 1956 relying upon the lessors' failure to assert a claim for rental under paragraph 12 in October 1951. The record fails to substantiate the claim. The record reveals that the management of Food Fair Stores, Inc., decided in March of 1956 to embark upon an intensive expansion policy, and that it would be beneficial from a chain-wide view to have separate corporations in each county where there were Food Fair stores, instead of as before, a corporation for the State. Judge Jones found that "defendants have failed to show that landlord did anything which misled them thereby resulting in injury to defendants * * *." Again, we agree.

## III

This question is presented by the cross-appellants, the lessors. It has been elaborately briefed and argued by them. Since the trial judge allowed them the maximum rental under the main lease and we have affirmed that ruling, the present question involves only the lease of October, 1951, covering the two lots leased for additional parking.

This lease followed the ten year term of the main lease, with

the concurrent right to renewals as therein provided. It also provided that the lessee could terminate the same at any time after October 31, 1953, by giving six months' notice, and, after July 1, 1952, the yearly rental therefor would be $1,200, plus 1% of the gross sales as defined in the main lease in excess of $2,320,000 up to gross sales of $2,700,000. This, of course, meant that the minimum yearly rental was $1,200 and the maximum might reach $5,000. The lease contains no express covenant relative to the manner in which the lessee should conduct its business, but the lessors argue that the leases and the surrounding circumstances establish the existence of an implied covenant on the part of the lessees not to divert sales from the premises leased from the lessors, but to use their (lessees') best efforts to derive the maximum volume of business from lessors' store.

Although percentage leases are generally governed by the rules of law applicable to ordinary leases, the peculiar features of provisions making rental dependent in some way upon the percentage of income from, or gross sales of, business on the leased premises frequently present difficult questions of construction, which render such leases in the nature of agreements *sui generis*. Annotation, 170 A.L.R. 1113. Considerable case law involving the construction of such leases has developed in recent years.

It has been held that where the percentage lease provides no minimum guaranteed rental or a purely nominal guarantee, the tenant is under an implied obligation to conduct the business in good faith. *Seggebruch v. Stosor,* 33 N. E. 2d 159 (Ill. App.); *Sinclair Refining Co. v. Davis,* 171 S. E. 150 (Ga. App.); *Sinclair Refining Co. v. Giddens,* 187 S. E. 201 (Ga. App.). It has also been held that if the guaranteed rental provides the landlord an adequate return on his investment and the percentage rental feature is in the nature of a bonus, there is no obligation upon the tenant as to the manner of conducting the business not expressed in the lease. *Jenkins v. Rose's 5, 10 & 25¢ Stores, Inc.,* 197 S. E. 174 (N. C.); *Cousins Investment Co. v. Hastings Clothing Co.,* 113 P. 2d 878 (Cal. App.); *Masciotra v. Harlow,* 233 P. 2d 586 (Cal. App.); *Percoff v. Solomon,* 67 So. 2d 31 (Ala.); *Monte Corp. v. Stephens,* 324 P. 2d 538

(Okla.); *Kretch v. Stark,* 193 N. E. 2d 307 (Oh.). And it has been further held that the tenants under percentage leases were, or were not, under an implied obligation as to the manner of conducting tenants' businesses, depending upon the intention of the parties, as expressed by the provisions of the particular leases, interpreted with a due consideration of the circumstances surrounding the execution of the lease contracts.[1]

However, the construction and application of the percentage features of the leases have depended largely upon the specific wording of the individual leases, and the character and nature of the questions involved have varied widely, due to the circumstances of each particular case. Hence, it would serve no useful purpose to attempt to formulate a comprehensive set of rules of construction applicable to all cases of percentage leases.

For the purposes of the decision herein, we need only state that in every contract there exists an implied covenant that each of the parties thereto will act in good faith and deal fairly with the others. *Automatic Laundry Service, Inc. v. Demas,* 216 Md. 544; 5 *Williston, Contracts* (3rd ed.), § 670. And we adopt the principle expressed by the Louisiana Court in *Selber Bros. v. Newstadt's Shoe Stores,* 194 So. 579, and thereafter, in substantially the same wording, by the Court of Appeals of California in *Professional Building of Eureka v. Anita Frocks, Inc.,* 2 Cal. Reptr. 2d 914: "Whether that doctrine [whether the lessor under a percentage lease guaranteeing a minimum rental has cause to complain when the business is conducted in such a way that it will not produce additional rent consisting of percentages of gross sales] is applicable to a given case depends upon the intention with which the parties entered into the contract of lease, as expressed in the contract, construed in the light of the circumstances in which the contract was made."

---

1. Examples follow: Selber Bros. v. Newstadt's Shoe Stores, 14 So. 2d 10 (La.); Lippman v. Sears, Roebuck & Co., 280 P. 2d 775 (Cal. Sup. Ct.); Professional Building of Eureka v. Anita Frocks, Inc., 2 Cal. Reptr. 914; Fox v. Fox Valley Trotting Club, 134 N. E. 2d 806 (Ill. Sup. Ct.); Tuttle v. W. T. Grant Co., 186 N. Y. S. 2d 655; Berland Realty Co. v. Hahne, 98 A. 2d 124 (N. J.); Palm v. Mortgage Investment Co. of El Paso, 229 S. W. 2d 869 (Tex.); Freeport Sulphur Co. v. Amer. Sulphur Royalty Co., 6 S. W. 2d 1039 (Tex.).

Applying the above principles to the allegations contained in the lessors' bill of complaint, we reach the conclusion that lessors cannot prevail. There is no allegation of a wilful intent on the part of the lessees to divert sales from lessors' store, nor was there an abandonment of the business. There is nothing in the record that showed a lack of good faith or fair dealing by the lessees. They were engaged in a highly competitive business (this feature thereof being very generally known) in a quickly growing community. The bill alleges that lessees expanded their business by opening two additional stores in the area and anticipated a third. There is nothing unusual in the large chain stores which sell food products in supermarkets adding to the number of their stores, when circumstances permit.

In addition, the leases involved are quite long, and they were entered into only after prolonged negotiations, and their provisions cover many contingencies. The main lease anticipated a possibility of a cessation of business in lessors' store, but a continuance of the lease, in which event a larger minimum rental was provided for. But no like provision was contained in the Parking Lot lease—it merely called for the $1,200 minimum and a percentage of gross sales, within certain limits, as set forth above. This, we think, could scarcely have been the result of oversight, and, if the lessors had been relying heavily upon the percentage provisions of this lease, they would have insisted upon an increased minimum rental for the parking area in the event of a cessation of business at their store, as they had in the main lease. We are dealing here only with an alleged *implied* covenant. There was, of course, no legal obstacle to prevent an express covenant being placed in the lease, so as to provide for lessors' contentions here. After considering the nature of lessees' business and the terms of the leases and after construing them in the light of the circumstances surrounding the parties at the time the leases were made, we are unable to conclude the parties impliedly covenanted that the lessees would not expand their business in the area of lessors' store. What the Supreme Court of Pennsylvania said in *Dickey v. Phila. Minit-Man Corp.*, 105 A. 2d 580, is, we think, apposite here:

536

"If an implied covenant, as claimed by [the lessors] should be held to arise in such cases what would be the extent of the restriction thereby imposed upon the lessee[s] ? Would it extend to each and every act on [their] part that might serve to reduce the extent of [their] business and thereby the percentage rental based thereon? Would it forbid [them], for example, if operating a retail store, from keeping it open for a fewer number of hours each day than formerly? Would it forbid [them] from dismissing salesmen whereby [their] business might be reduced in volume? Would it forbid [them] from discontinuing any department of [their] business even though [they] found it to be operating at a loss? It would obviously be quite unreasonable and wholly undesirable to imply an obligation that would necessarily be vague, uncertain and generally impracticable."

*Order of Judge Cullen, sustaining lessees' demurrer in part, and Judge Jones' decree affirmed, each side to pay ½ the costs.*