**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SUBURBAN MORTGAGE ASSOCIATES,
INCORPORATED,
<u>Plaintiff-Appellant,</u>

v.                                                                                    No. 98-1290

EXEL PROPERTIES, LIMITED; JOEL B.
HART; MATTHEW C. HART,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Walter E. Black, Jr., Senior District Judge.
(CA-95-3784-B)

Argued: March 3, 1999

Decided: April 16, 1999

Before WILKINS and WILLIAMS, Circuit Judges, and LEE,
United States District Judge for the Eastern District of Virginia,
sitting by designation.

_____

Vacated and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Kelso Taylor, PATTON BOGGS, L.L.P., Wash-
ington, D.C., for Appellant. John Anthony Wolf, OBER, KALER,
GRIMES & SHRIVER, P.C., Baltimore, Maryland, for Appellees.
**ON BRIEF:** Kenneth A. Grigg, Ruth L. Ramsey, Michael T. Wood,

PATTON BOGGS, L.L.P., Washington, D.C., for Appellant. J. Kirby Fowler, Jr., OBER, KALER, GRIMES & SHRIVER, P.C., Baltimore, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Suburban Mortgage Associates, Inc. (Suburban) filed suit in the Circuit Court of Montgomery County, Maryland, asserting that Exel Properties, Ltd. and its principals, Joel and Matthew Hart (collectively Exel), breached their contract when Exel declined to accept proffered financing of $4.4 million without remitting the contractually required commitment fee. Exel removed the case to the United States District Court for the District of Maryland on diversity grounds and filed a counterclaim for breach of contract asserting, among other things, that Suburban concealed relevant facts regarding the source of the financing and thereby breached the implied duty of good faith and fair dealing. After a six-day jury trial, the jury concluded that Exel was not liable for breach of contract, finding against Suburban on the primary claim. Additionally, the jury's verdict favored Exel on its counterclaim. The jury declined, however, to award damages.

Suburban appeals, asserting that the district court erred when it failed to sustain its motion for directed verdict on the counterclaim.[1] We conclude that two of the four theories presented to the jury in support of Exel's counterclaim did not state a cognizable action under Maryland's implied duty of good faith and fair dealing. Because the jury rendered a general verdict, we do not know the ground for its verdict. Accordingly, we vacate the district court's judgment on the

_____

[1] Suburban raised two additional issues on appeal. Because this first issue is dispositive, however, we do not reach them.

2

counterclaim and remand for proceedings consistent with this opinion.

I.

Exel, a limited partnership formed in 1992 for the purpose of purchasing the Shoppes at Loggers Run (the Shoppes), a shopping center in Boca Raton, Florida, sought refinancing of the Shoppes in 1994 in order to use the proceeds of the refinancing to purchase an additional shopping center. C. Robert Burgess, president of MortgagePro Services Corp., a commercial mortgage brokerage in Florida, recommended Suburban for the refinancing. Burgess informed Exel that Suburban participated in a conduit lending program with Merrill Lynch. Exel was especially interested in Suburban's lending program because of the Merrill Lynch connection. Exel believed that if the loan refinancing the Shoppes was backed by Merrill Lynch, it would open the door to a long-term financing relationship between Exel and Merrill Lynch.

Subsequently, on September 13, 1994, Exel filed a loan application with Suburban requesting financing of $4.8 million. The application gave Suburban the exclusive right during a sixty-day period to provide a loan commitment for the refinancing of the Shoppes. If Suburban committed to fund Exel's loan and issued a closing confirmation, Suburban was entitled to a commitment fee of 2% of the loan proceeds, regardless of whether Exel accepted the loan on the proffered terms. Suburban, however, was ultimately under no obligation to fund the loan. Even if it did offer to fund the loan, Suburban was not required under the terms of the loan application to provide the full $4.8 million requested by Exel. Further, nowhere in the loan application did it specify that the source of the funds should be Merrill Lynch.

On November 22, 1994, Suburban Mortgage issued a Mortgage Loan Commitment (the Commitment) to Exel. The Commitment incorporated by reference the terms and conditions of the loan application, and contained an integration clause that provided, "[t]here is no understanding with respect to the Loan, whether written or oral, except as expressly set forth herein or expressly incorporated herein by reference." (J.A. at 532 (¶ 8).) The Commitment further stated that

3

Suburban's obligation to fund the loan was conditioned on its discretionary decision to issue a closing confirmation no later than forty-five days from the date of the Commitment. Additionally, in paragraph ten, the Commitment provided that "[i]n the event of a dispute arising under the Application or this Commitment, the prevailing party shall be entitled to recover from the other its reasonable attorneys' fees and costs actually incurred." (J.A. at 532 (¶ 10).) Such disputes were to be governed by the substantive law of Maryland. The Commitment became void if the borrower did not sign the Commitment and submit the balance of the application fee within five days. Exel signed the Commitment and remitted the balance of the application fee, $5,500, the next day, November 23, 1994.

Although Suburban continued to process the loan, and Exel continued to submit documents, the closing confirmation was not issued within the forty-five day window outlined in the Commitment. At no time after the forty-five day deadline passed did Exel instruct Suburban to stop processing the loan. Similarly, at no time did Suburban execute a written extension of the forty-five day time period.[2]

Unbeknownst to Exel, Merrill Lynch had unilaterally terminated its conduit financing agreement with Suburban on November 14, 1994.[3] Nevertheless, Merrill Lynch indicated that it would continue to process some of the loans that were already in progress, including the Exel loan. Merrill Lynch's preliminary oral approval of Exel's loan package in November prompted Suburban to issue the Commitment. On the basis of the preliminary oral approval, Suburban continued to process the loan and continued to assure Exel that its prospects of obtaining full funding of $4.8 million from Merrill Lynch were good. Ultimately, Exel's loan was approved by Merrill Lynch; however, it

_____

[2] The Commitment stated that all changes must be memorialized in writing and signed by both parties.
[3] It is undisputed that Suburban knew that Exel understood that the financing for its loan would come from Merrill Lynch. Further, Suburban acknowledged that it never told Exel that the conduit funding relationship had been terminated. It was hotly contested at trial, however, whether Suburban understood that the funding from Merrill Lynch was essential to Exel's willingness to pursue the loan.

4

was approved for only $3.2 million, a significantly smaller sum than requested.

Suburban also submitted the final loan package to Morgan Stanley, with whom it hoped to establish a new conduit financing arrangement. On February 17, 1995, a representative of Morgan Stanley orally committed to funding the loan for $4.4 million dollars, conditioned upon inspecting the property. Later that day, a representative of Suburban contacted Exel and presented "a good news, bad news scenario." (J.A. at 264.) The bad news was that Merrill Lynch was only willing to refinance the Shoppes for $3.2 million and the good news was that Suburban could nevertheless provide $4.4 million to Exel with the backing of Morgan Stanley. Exel wanted to proceed with the loan quickly and made arrangements for a Morgan Stanley representative to inspect the property right away. After viewing the property, Morgan Stanley made an oral commitment to Suburban that it would approve the loan. Immediately thereafter, on February 21, 1995, Suburban issued its closing confirmation for $4.4 million.

By this time, however, Exel was shocked that the financing was not coming from Merrill Lynch and as a result had lost faith in Suburban's ability to close the deal. After a meeting between Exel and a representative of Morgan Stanley during which the Morgan Stanley representative indicated that the $4.4 million was not a firm offer, Exel became further frustrated by the potential delay and concluded that Suburban had been misleading it. After Exel expressed these feelings to Suburban, a conference call took place in which representatives of Exel, Suburban, and Morgan Stanley all participated. During the call, the Morgan Stanley representative reiterated that it had not made a firm commitment to provide funding to refinance the Shoppes. Upon its receipt of that confirmation that the Morgan Stanley offer was not firm, Exel immediately stated that the deal with Suburban was "dead" and that it would obtain financing from another lender. (J.A. at 379.)

II.

Thereafter, Suburban filed a breach of contract action in the Circuit Court for Montgomery County, Maryland. Suburban asserted that

5

Exel failed to remit the commitment fee due upon issuance of the closing confirmation pursuant to a clause in the loan application:

> Within five (5) days after issuance of the Closing Confirmation, Applicant shall pay to Lender a Commitment Fee in the amount of 2.0% of the Final Loan Amount set forth in the Commitment. If the Loan does not close in a timely manner for any reason other than a default by Lender, then the Preliminary Commitment Fee or Final Commitment Fee, as applicable, for such Loan shall be retained by Lender as liquidated damages.

(J.A. at 520 (¶ V.2).) Because Exel had never paid the commitment fee of $88,000 due to Suburban upon Exel's receipt of the closing confirmation dated February 21, 1995, which confirmed that Suburban would provide a loan of $4.4 million to refinance the Shoppes, Suburban claimed that Exel breached the contract and owed $88,000 in damages.

Exel removed the case to the United States District Court for the District of Maryland on December 11, 1995.[4] Approximately one year later, on January 7, 1996, Exel moved for leave to file a counterclaim. The district court granted Exel's motion. In the counterclaim, Exel set forth four misrepresentation-type claims as breaches of the implied duty of good faith and fair dealing: (1) that Suburban breached the contract because Suburban was aware of the importance of the Merrill Lynch relationship to Exel and nevertheless failed to disclose that Merrill Lynch had terminated the conduit financing arrangement and that Suburban had sought alternative funding from Morgan Stanley;

---

[4] The case was removed pursuant to 28 U.S.C.A. § 1441(b) (West 1994) (providing that defendants may remove cases from state court to federal court if the federal court originally would have had jurisdiction). In this case, the district court could assert jurisdiction due to the parties' diversity of citizenship. See 28 U.S.C.A. § 1332 (West 1993 & Supp. 1998). Suburban is a Maryland corporation with its principal place of business in Maryland. Exel is a Florida partnership with its principal place of business in Florida. Additionally, the original amount in controversy was $88,000. See 28 U.S.C.A. § 1332(a) (West Supp. 1998) (stating that the amount in controversy must exceed $75,000).

6

(2) that Suburban misrepresented that Morgan Stanley had approved the $4.4 million loan when, in fact, it had not done so; (3) that Suburban failed to keep Exel accurately informed regarding its lack of progress with Merrill Lynch; and (4) that Suburban should have informed Exel that it submitted Exel's loan package to an entity other than Merrill Lynch. In addition, Exel claimed that Suburban breached the contract when it failed to issue the closing confirmation within the forty-five days specified in the contract documents and breached the contract by incompetently processing its loan request. Finally, Exel asserted that Suburban issued a false and baseless closing confirmation in order to create Exel's obligation to pay the $88,000 fee. Exel pleaded damages of $550,000 resulting from the long delay it experienced before eventually obtaining financing from another source.

Both the claim and the counterclaim proceeded to a jury trial. At the close of Suburban's evidence, Exel moved for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(a), on the primary claim. The district court denied the motion. At the close of all evidence, Suburban moved for a directed verdict on Exel's counterclaim.[5] The district court also denied this motion, and sent both the primary claim and the counterclaim to the jury.

The jury was instructed on, inter alia, four possible bases for a finding of breach of contract on Exel's counterclaim: (1) Suburban issued a baseless closing confirmation; (2) Suburban failed to meet its contractual deadlines; (3) Suburban failed to disclose Merrill Lynch's decision to terminate the conduit program; and (4) Suburban misrepresented the true status of the loan processing. The final two theories were based upon the implied contractual duty of good faith and fair dealing. As a result, the jury was also given a general instruction on that legal theory:

> The duty of good faith obligates a party to exercise good faith in performing its contractual obligations. However, the duty of good faith and fair dealing may not override or modify explicit contractual terms. Good faith includes honesty

_____

[5] A motion for directed verdict is equivalent to a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50. See Fed. R. Civ. P. 50, Advisory Committee Notes on 1991 Amendment.

in fact. This duty of good faith and fair dealing prohibits a party from acting arbitrarily, unreasonably, and in bad faith. It also prohibits one party from acting in such a manner as to prevent the other party from performing its obligations under the contract.

(J.A. at 444.)

After deliberations, the jury returned its verdicts. On the primary claim, the jury concluded that Suburban had not proven all the elements of breach of contract against Exel.**6** Additionally, the jury returned a general verdict on the four possible theories of liability submitted to it for Exel's counterclaim against Suburban. The jury found that Exel had proven breach of contract against Suburban. The jury, however, did not award damages to Exel. After the verdict was read, Suburban did not renew its motion for judgment as a matter of law. See Fed. R. Civ. P. 50(b).

Exel then submitted a motion for attorneys' fees, pursuant to paragraph ten of the Commitment which provided "[i]n the event of a dispute arising under the [a]pplication or this Commitment the prevailing party shall be entitled to recover from the other its reasonable attorneys' fees and costs actually incurred." (J.A. at 532.) Exel argued that it was the prevailing party in the action because it had successfully defended the primary claim by Suburban, and had been successful in convincing the jury that Suburban had breached the parties' agreement. Exel requested fees of $159,259.00 and costs of $9,799.30. Suburban filed a responsive motion opposing Exel's request for fees. Suburban also argued that it was the prevailing party and therefore entitled to attorneys' fees because it had successfully fended off Exel's counterclaim, which was worth more than five times as much as Suburban's primary claim. Suburban requested fees of $88,140 and costs of $6,044.09. After a hearing, the district court determined that Exel was the prevailing party and awarded reasonable attorneys' fees and costs in the amount of $122,593.14. (J.A. at 182.)

Suburban filed a timely notice of appeal.

_____

**6** Suburban does not appeal this determination.

8

III.

On appeal, Suburban makes three arguments. First, Suburban argues that the district court erred when it denied Suburban's motion for directed verdict on Exel's counterclaim because the counterclaim was not based upon any contractual duty owed to Exel. Second, Suburban maintains that insufficient evidence was presented to support the jury's verdict in favor of Exel on the counterclaim. Third, Suburban asserts that the district court erred when it determined that Exel was entitled to its fees and costs as the prevailing party.

We agree with Suburban that the district court erred when it failed to grant judgment as a matter of law in part. The final two theories tendered by Exel in support of its claim for breach of contract fail as a matter of law under Maryland's version of the implied contractual duty of good faith and fair dealing. Thus, we conclude that the district court should have eliminated those claims from the case in response to Suburban's motion for directed verdict. Because the jury rendered a general verdict, we vacate and remand[7] for further proceedings consistent with this opinion.[8]

A.

We review the district court's denial of Suburban's motion for directed verdict de novo. See Princess Cruises, Inc. v. General Elec. Co., 143 F.3d 828, 831 (4th Cir. 1998). Judgment as a matter of law is appropriate when, viewed in the light most favorable to the non-

_____

[7] Because Suburban did not renew its motion for judgment as a matter of law after the jury returned its verdict as required under Federal Rule of Civil Procedure 50(b), our remedial powers are limited. See Benner v. Nationwide Mut. Ins. Co., 93 F.3d 1228, 1234 (4th Cir. 1996). "In the absence of a proper Rule 50(b) motion after the verdict, we cannot order an entry of judgment contrary to that made by the district court . . . ." Id. Rather, we may only vacate and remand, as we do here. See id.

[8] As a result of our disposition, we need not reach the question of whether sufficient evidence supported the jury's verdict on the counterclaim. Also, because the results of any proceedings upon remand may alter the prevailing party calculus, it would be inappropriately speculative for us to address that issue.

moving party, see Westfarm Assocs. Ltd. Partnership v. Washington Suburban Sanitary Comm'n, 66 F.3d 669, 683 (4th Cir. 1995), and "without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment," Singer v. Dungan, 45 F.3d 823, 826 (4th Cir. 1995) (citation omitted).

B.

By express contractual agreement, Maryland law governs this case. See American Motorists Ins. Co. v. ARTRA Group, Inc., 659 A.2d 1295, 1305 (Md. 1995) (noting that Maryland law will recognize choice of law provisions contained in contracts). Under Maryland law, "in every contract there exists an implied covenant that each of the parties thereto will act in good faith and deal fairly with the others." Food Fair Stores, Inc. v. Blumberg, 200 A.2d 166, 174 (Md. 1964). However, "[t]o the extent that a duty of good faith and fair dealing exists in Maryland, it is of very narrow scope." Dupont Heights Ltd. Partnership v. Riggs Nat'l Bank, 949 F. Supp. 383, 389 (D. Md. 1996). The duty "does not change the terms of the contract." Waller v. Maryland Nat'l Bank, 620 A.2d 381, 388 (Md. Ct. Spec. App. 1993). Under Maryland law, the implied duty of good faith and fair dealing "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." Parker v. Columbia Bank, 604 A.2d 521, 531 (Md. Ct. Spec. App. 1992).

Two of the four alternative theories sent to the jury in support of Exel's breach of contract counterclaim had as their foundation the duty of good faith and fair dealing: (1) that Suburban failed to disclose Merrill Lynch's decision to terminate the conduit program; and (2) that Suburban misrepresented the true status of the loan processing. These claims must fail as a matter of law.

Maryland courts have made clear that the duty of good faith and fair dealing is limited to the scope of the contract documents and cannot "obligate a lender to take affirmative actions that the lender is clearly not required to take under its loan documents." Id. Both of Exel's claims at issue here are based upon Exel's expectation that Merrill Lynch would be the source for the funds it was seeking from Suburban. Below, Exel asserted both that Suburban breached the con-

tract when it failed to inform it that Merrill Lynch had canceled the conduit program and also that Suburban should have informed Exel that it was having trouble attaining financing from Merrill Lynch before it turned to Morgan Stanley as a source for the $4.8 million. Unfortunately, however, Exel's expectations regarding Merrill Lynch were never memorialized in the contract documents.

The facts are clear on this point. Exel signed and became bound by two separate documents issued at different times over the course of its business relationship with Suburban that made no mention of Merrill Lynch, or of any particular source of funds. Without a specific reference to the ultimate source of its financing, Suburban was not contractually bound to provide funding from Merrill Lynch, or even to seek funding from Merrill Lynch. Under Maryland law, the implied duty of good faith and fair dealing cannot act as a substitute for express contractual terms and cannot change the terms of the contract. See Waller, 620 A.2d at 388. Exel's understanding that Merrill Lynch would be providing the money for the loan simply is not sufficient to support a claim under the implied duty of good faith and fair dealing. That duty is carefully circumscribed by express contractual terms. See Parker, 604 A.2d at 531.

As noted above, Exel's factual claims are insufficient to support recovery for breach of contract under the theory of breach of the implied duty of good faith and fair dealing. Therefore, the district court erred in rejecting in toto Suburban's motion for directed verdict. Because it is impossible to determine whether the jury's general verdict rests upon the legally erroneous theories, it"may not stand as the basis for judgment." Flowers v. Tandy Corp. , 773 F.2d 585, 591 (4th Cir. 1985); accord Barber v. Whirlpool Corp., 34 F.3d 1268, 1278 (4th Cir. 1994).

IV.

Accordingly, we vacate and remand for proceedings consistent with this opinion.

VACATED AND REMANDED

11