## BALTIMORE AND ANNAPOLIS RAILROAD COMPANY *v.* CAROLINA COACH COMPANY

[No. 36, October Term, 1954.]

238

*Decided February 10, 1955.*

*Motion for rehearing filed March 3, 1955, denied March 16, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Joseph I. Huesman,* with whom were *R. E. Lee Marshall* and *Marshall, Carey & Mundy* on the brief, for the appellant.

*Benjamin C. Howard,* with whom was *Clyde Y. Morris* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The appellee sued the appellant in assumpsit in the Court of Common Pleas of Baltimore City to recover for overpayments of rent made to the appellant by the appellee as the result of a mistake, and judgment was entered in favor of the appellee for $4,281.82. This amount was stipulated as correct, if the appellee was entitled to recover at all. The controversy grows out of a sub-lease of a bus terminal and provisions therein contained dealing with the right of the appellee, at its election, to pay one-half of the salary of a joint ticket agent and to credit any amounts so paid against the amount of rent reserved under the sub-lease.

Although the appellant asserted a claim in the lower court that the sub-lease should be so construed (largely as a result of the conduct of the parties) as to uphold its right to the amount in dispute, it abandoned this claim in this Court. It also abandoned another claim asserted in the trial court—that the original lease had been modified by the parties. As the case is now presented the appellant contends first, that no mistake was proven, and second, that even if the evidence was enough to establish a mistake, the overpayments were made voluntarily and under a mistake of law for which no recovery may be had. The appellee contends that the overpayments were not made voluntarily but were the result of a mistake for which recovery should be allowed.

The essential facts out of which the case grows are these:

The appellant, Baltimore & Annapolis Railroad Company ("B. & A.") was authorized by the Public Service Commission early in 1950 to discontinue its passenger rail service between Annapolis and Baltimore and to convert its operations to bus service. For this it needed a bus terminal in Baltimore. It sought to lease a property suitable for the purpose at No. 100 South Howard Street. In the course of negotiations it learned that Red Star Motor Coaches, Inc. ("Red Star"), which then operated buses on other routes, was a tenant of the premises under a lease which still had another year to run. B. & A. thereupon expanded its negotiations so as to make arrangements with Red Star under which B. & A. could promptly start using the terminal. Agreements were reached by which B. & A. leased the terminal from its owners and made a sub-lease for a period of two years, renewable for three more, to Red Star.

Section 3 of the sub-lease agreement fixed the rent which Red Star, as Tenant, agreed to pay to B. & A. as Landlord, suject to this proviso: "provided that the amount of said rental shall be reduced by the sum or sums paid monthly by the Tenant for the joint ticket agent in accordance with the provisions of Paragraph No. 5(1) hereof." Under paragraph 5(1) B. & A. agreed to "provide adequate facilities for the operation of the ticket office for the sale of* [Red Star's] tickets," Red Star was to have "joint control with* [B. & A.] over one ticket agent" and the right to pay one-half of the salary of such agent, his hours of duty and his obligation to sell tickets for Red Star and B. & A. were stated, other ticket agents employed by B. & A. were to sell tickets for the account of B. & A., Red Star and other sub-lessees but were not to be entitled to compensation from Red Star, all ticket agents were to make daily reports of sales for Red Star's account and to remit cash collections to Red Star, and B. & A. undertook to "pro-

vide an adequate number of ticket agents on duty in the ticket office."

At the outset the joint ticket agent was an old employee of Red Star, and he continued to be carried on Red Star's payroll and to receive his entire salary from that employer. Red Star took credit for only one-half of his salary against each monthly rental bill rendered by B. & A. Since B. & A. was obligated under the sublease agreement to pay the salaries of ticket agents and Red Star was entitled to credit against the rent for one-half of the salary of the joint agent, the net effect of these charges and credits as made was that Red Star actually took credit against B. & A. for only one-half the amount to which it was entitled.

In December, 1950, the original joint ticket agent resigned. He was replaced by another agent who was an employee of B. & A. B. & A. continued to pay this agent's full salary, but after he became the joint agent B. & A. added one-half of his salary to the monthly bills for rent which it submitted to Red Star. Red Star and Carolina Coach Company ("Carolina") which became Red Star's successor as a result of a merger effected as of July 1, 1952, paid these charges until January, 1953, without making or claiming any deduction from the rent on account of one-half of the joint ticket agent's salary. By a letter dated January 21, 1953, Carolina, through its counsel, demanded repayment of one-half of the salaries of joint ticket agents, B. & A. refused the demand and Carolina thereafter brought this suit to enforce it.

Carolina contends that B. & A. did not present in the trial court and therefore cannot raise in this Court the ground upon which it now seeks a reversal of the judgment, which is that the payments were voluntarily made under a mistake of law for which no recovery can be had. We think, however, that the question of mistake and its effect was before the trial court and that we are not precluded from considering it under Rule 9 of our Rules and Regulations Respecting Appeals.

It seems to us perfectly clear—and B. & A. now concedes—that the terms of the sub-lease are plain and unambiguous to the effect that B. & A. was obligated to furnish and pay for the services of all necessary ticket agents and that Red Star and Carolina were entitled to deduct from the rent one-half of the salary of one joint ticket agent, designated as such, if they chose to pay it. They did elect to make such payments, and it seems evident that when they paid the rent in full without making such deductions, they made payments of the deductible amounts by mistake. In a business relationship such as existed here, there is no basis for presuming that a gift was intended. (Any difference in the handling of the payments during the period up to December 16, 1950 and during the period subsequent thereto seems immaterial in view of the stipulation as to the amount due if Carolina is entitled to recover. The fundamental mistake was the same in each period.)

The question of the recovery of money paid under a mistake was extensively reviewed in *Oxenham v. Mitchell*, 160 Md. 269, 153 A. 71, in which the opinion was by Judge Parke. In that case persons who were in fact the owners in fee simple of a tract of land erroneously believed that there was an outstanding leasehold estate and that, in order for them to give a clear title to the property, it was necessary to reopen an estate long since administered and to acquire the supposed leasehold interest. Steps were taken towards that end and the true owners paid to the administrator d.b.n. the full appraised value of the non-existent leasehold. On being apprised of their error the true owners sought in the Orphans' Court a refund of the amount they had paid. The Orpans' Court rejected their claim and this Court reversed the decree of the Orphans' Court, holding the true owners entitled to have the money refunded, less the fee, costs and expenses incident to the proceedings which they had caused to be initiated.

In the course of the opinion Judge Parke said: "The rule of law and equity is that money paid under mistake

may be recovered when it is against good conscience for the recipient to retain the money. This rule is subject to the general, but not universal, exception that money paid under mistake of law cannot be recovered. * * * The rule and its exception are familiar, and have been enforced by this court in many instances, which, however, do not afford precedents to control the pending case. * * * The difficulty has been to distinguish between a question of law and one of fact; and there are frequent records where the question is a mixed one of both law and fact. Here the parties knew the facts, which were partly of documents of record and partly in parol, and which occurred in the course of over a half century. These combined facts, which they knew, and the law, which they were presumed to know, when taken and considered together, issued from this conjunction and interaction of law, fact, and construction of documents as another fact. *Snell's Equity* (15th Ed.), 433, 434; *Story's Eq. Juris.* (14th Ed.), secs. 166, 184. This fact was that the lease in question had determined; but the joint tenants, in the erroneous conviction that the lease was extant, procured an administration in order to acquire the leasehold estate; bought and paid for and received a grant of the term, which neither the joint tenants, the administrator, nor the orphans' court, would have done or united in doing, if all had not been animated by the common misapprehension that the legal estate in the lease was subsisting. This misconception is called by eminent authority a mistake of fact, although by some regarded as one of law. It is justly observed by Pomeroy: 'A private legal right, title, estate, interest, duty or liability is always a very complex conception. It necessarily depends so much upon conditions of fact, that it is difficult, if not impossible, to form a distinct notion of a private legal right, interest or liability separated from the facts in which it is involved and upon which it depends. Mistakes, therefore, of a person with respect to his own private legal rights and liabilities may be properly regarded—as in a great measure they

really are—and may be dealt with as mistakes of fact. Courts have constantly felt and acted upon this view, though not always avowedly.' *Pomeroy's Equity Jurisprudence* (4th Ed.), sec. 849. It is not the less representation of fact because the fact stated involves a conclusion of law, as pointed out by Sir George Jessel in *Eaglesfield v. Marquis of Londonderry,* L. R. 4 Ch. Div. 693, 702, 703; *Cooper v. Phibbs,* L. R. 2 H. L. 149, 170; *Story's Eq. Juris* (.14th Ed.), sec. 186."

It is true that *Oxenham v. Mitchell, supra,* arose on appeal from an Orphans' Court and was decided upon equitable principles. This does not, however, detract from its applicability in determining what is a question of law and what is a question of fact. That problem is the same whether the suit is at law or in equity.

The much earlier case of *Baltimore & Susquehanna R.R. Co. v. Faunce,* 6 Gill 68, is perhaps closer on its facts to the instant case. There a railroad company was bound to pay for work done only so much as its engineer certified. Its agent supposed that he was paying no more, but actually did pay more due to failure to take into account a deduction made by the engineer on account of work done by a third party. This was held to be a mistake of fact, and the railroad company was held entitled to recover the excess payment. The Court said (at pages 77-78) : "A payment cannot well be said to be made voluntarily when it is made in consequence alone of a false view of facts. The assent is only induced by the conviction then prevailing in the mind, that the particular fact existed, and is scarcely to be distinguished from an assent or agreement to pay on the condition that the fact did exist. The subsequent discovery of the error destroys the whole basis of the agreement, and the parties are restored to their original condition and rights. Of what avail is it, that industry and vigilance might have procured the information? Still the party has done an act he did not intend to do, and did not know or believe he was doing. In this case, the agent assented and agreed to pay only what the engineer

certified; he supposed he was paying no more when he delivered the notes to defendants, and his volition was no more involved in any amount beyond, than it would have been had he paid them a bank note of $1,000, misreading and intending it to be a note of $100."

*Pomeroy's Equity Jurisprudence,* 5th Ed., Sec. 849, says, as did the preceding edition, that "Mistakes * * * of a person with respect to his own private legal rights and liabilities may be properly regarded—as in great measure they really are,—and may be dealt with as mistakes of fact."

The *Restatement, Restitution,* in the Introductory Note to Ch. 2, Topic 3, "Mistake of Law," (page 180) points out that the broad rule against relief from the consequences of a mistake of law has been considerably limited to avoid the injustice which would result from the universal application of so broad a rule and that "by a process of attrition it has been limited to cases similar to that of *Bilbie v. Lumley* [2 East 469, in which the broad rule was first announced], that is, to cases where a benefit has been conferred upon another because of a supposed duty to him in response to an honest demand by him." Perhaps the *Oxenham* and *Baltimore & Susquehanna R.R.* cases represent a part of that attrition. See also *Williston, Contracts,* Rev. Ed., Sec. 1581, for a criticism of the broad rule.

We are of the view that the error of Red Star and of Carolina as to their private rights and liabilities in making the payments in question should be regarded, under *Oxenham v. Mitchell, supra,* and *Baltimore & Susquehanna R.R. Co. v. Faunce, supra,* as not a mistake of law, pure and simple, so as to bar a recovery of the overpayments, but as involving a mistaken view of the facts.

That Red Star or Carolina had at hand the means of discovering the error is not a bar to this suit. *Baltimore & Susquehanna R.R. Co. v. Faunce, supra; Restatement, Restitution,* Sec. 59.

There is no suggestion that the payments were by way of compromise, so that there can be no bar for that reason.

246

Believing that the conclusion of the trial court was correct, we affirm the judgment.

*Judgment affirmed, with costs to the appellee.*