DEBELIUS REALTY COMPANY ET AL.
*v.* CHASSAGNE ET UX.

[No. 133, September Term, 1970.]

*Decided December 14, 1970.*

*Motion for rehearing filed January 13, 1971; denied February 1, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*Edward B. Rybczynski* for appellants.

*L. Robert Evans*, with whom was *Leroy E. Gerding, Jr.*, on the brief, for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

At issue is the right of a seller of land to recover a part of a payment of a real estate commission made to

the selling broker. The drama began in 1962 when Debelius Realty Company (Francis C. Debelius) sent a salesman, Feehely, to urge Leo J. Chassagne who owned unimproved acreage fronting on what is now Merritt Boulevard (part on one side, part on the other) to sign an exclusive listing agreement calling for a commission of 10% of the sales price. Chassagne refused to sign, saying, he testified, "I don't make no agreements or sign up with nobody, understand?" Debelius testified Chassagne said "he wouldn't sign anything unless we brought a deposit and a contract." Feehely and Debelius both testified that later there was an oral agreement that the commission would be 10%. Francis Debelius himself later prepared three separate contracts of sale on standard forms incorporating offers which Chassagne was tendered but would not accept. Each provided that the sellers agreed to pay to Debelius a commission "in accordance with the Standard Schedule of Commissions of the Real Estate Board of Greater Baltimore."

Meanwhile, Chassagne sold his land on one side of the road to a buyer not procured by Debelius. The commission on that sale was 10% on the first $5,000 and 6% on the balance of the purchase price. Thereafter Debelius procured one Chilis, who offered $90,000 for the remaining land. Chassagne testified that, when the offer was presented to him, he told Debelius, Feehely and Chilis: "These commissions will be the same thing on this side of the road as it is on [the other] side." Judge Turnbull asked: "Did you tell them the rate at which the commissions were computed?" and the answer was: "I believe for the first ten thousand dollars it was ten per cent — or was it? Yeah, ten per cent and six per cent for the rest * * *. [H]ere's what I do know, that I told them the same commissions we paid over there we are going to pay on this side." Judge Turnbull asked: "You are sure of that?" and Chassagne responded: "I'm sure of that."

Chilis' lawyer drew a contract satisfactory to Debelius and Feehely, containing the same provision for a commission that Debelius had provided in his three drafts

of contracts—the standard Real Estate Board commission.

When settlement time came, Chassagne's lawyer had died and he was accompanied by that lawyer's young lawyer son. Debelius was given a check by the settlement officer for a $9,000 commission—10% of the $90,000 sales price. Chassagne testified that he said to Debelius:

> " 'You fouled up there, didn't you boy?' I said, 'You got to overcharge me,' or something like that. And he throwed his hands up in the air, he said it was open ground, or something."

Debelius testified that the bill for the commission read: "Agreed upon commission nine thousand dollars"; that he presented the bill to the young lawyer who told Chassagne that it was the correct commission. Within a day or two the young lawyer called Debelius to say that there had been an overcharge of the commission which should be refunded. Debelius refused to refund and suit was filed. It was stipulated that the Real Estate Board Schedule of Commissions included the following:

> "(b) *Unimproved Property*: Including lands to which improvements add no market value, 10% on the first $5,000 and 6% on the balance, except as provided in paragraphs (e) (farms) and (h) (sub-divisions) of this section," and
> "(e) *Farms,* residential waterfronts and country estates: 6% higher rates not exceeding 10% are approved and recommended, when specified in the original listing or employment contract."

When Debelius was asked why he felt he was entitled to a 10% commission, he did not say that it was by virtue of the oral agreement to pay 10% he claimed Chassagne made, but rather said it was because the land was farmland and because:

> "It was an unusual sale, in respect that one day we had two lots for sale, we never had an ex-

clusive listing, the property in the past had failed percolation tests, that zoning would have to be obtained, and we could be working for a year, a year and a half, and another fellow get there, another broker get there ten minutes ahead of us, and we would not have had a sale, and all our work would have been in vain."

Judge Turnbull found as a fact that there was not an employment of Debelius by Chassagne until the final contract of sale between Chassagne and Chilis was signed, calling for a commission under the Real Estate Board Schedule. He also found that, since there was no agreement to pay more, the commission would have been 6% of the price or $5,400 if the property had been farm land. The land had not been farmed since 1940 and said Judge Turnbull:

"I find as a fact that this was not a farm, had not been used as a farm for many years, and was in fact at the time of the signing of the contract potential commercial development property. My finding in that respect is supported by the contract itself, Plaintiffs' Exhibit No. 1, which provides, beginning on Page 1, 'Contingent and conditioned upon the zoning of the entire property hereby sold for commercial use; said zoning to be in full force and effect at the time of settlement.' And then, further provides, and I paraphrase, that if the zoning is not accomplished within six months the buyers shall have the right to cancel, and the deposit should be refunded.

"So that to me it is perfectly obvious that what was contemplated by the seller, the purchaser and the agents was the sale not of a farm, but the sale of commercial property. At the time of the consummation of the contract the property, according to the evidence, had finally been

> zoned for commercial uses, and the property transferred was commercial property."

The commission payable under the standard schedule for unimproved commercial land was $5,600. The judgment appealed from by Debelius was in favor of Chassagne for $3,400, the difference between $9,000 and $5,600.

We think the evidence permitted the findings of fact that Judge Turnbull made and that he did not err in his conclusion that the commission should be that scheduled for the sale of unimproved commercial property.

There remains the matter of the effect of Chassagne's permitting Debelius to receive $9,000 as a commission at the settlement. On this point Judge Turnbull found that the $9,000 was paid under protest "reserving the rights of [Chassagne] to take such further action as [he] deemed proper to protect [his] interests," and that there was in essence, although not in form, a kind of escrow arrangement. We do not read the evidence to support this version of what occurred. A finding that Chassagne did not think the commission had been correctly calculated and a finding that the young lawyer who advised him it had been was mistaken would certainly have been permissible and, we think, almost compelled. This being so, the extra $3,400 was money paid under a mistake of fact and is therefore recoverable by the payor. See *B. & A. R.R. Co. v. Carolina Coach Co.*, 206 Md. 237. There the Coach Company sued the railroad in assumpsit to recover overpayments of rent made by mistake under a sublease. The issues were whether there had been a mistake and whether the payments were voluntary and made under a mistake of law (in which case ordinarily they would not be recoverable) rather than under a mistake of fact (in which case they would be recoverable). Under the governing lease, the monthly rental paid by the Coach Company for joint use with the railroad of a terminal was to be reduced by the half portion of the monthly salary paid by the Coach Company to a joint ticket agent. The Coach Company did not deduct the amount of the half salary

over a period of time and was permitted to recover from the railroad the sums it had overpaid. Judge Brune for the Court quoted from *Oxenham v. Mitchell,* 160 Md. 269, 278-280, in part as follows:

"The rule of law and equity is that money paid under mistake may be recovered when it is against good conscience for the recipient to retain the money. This rule is subject to the general, but not universal, exception that money paid under mistake of law cannot be recovered. * * * The rule and its exception are familiar, and have been enforced by this court in many instances, which, however, do not afford precedents to control the pending case. * * * The difficulty has been to distinguish between a question of law and one of fact; and there are frequent records where the question is a mixed one of both law and fact. Here the parties knew the facts, which were partly of documents of record and partly in parol, and which occurred in the course of over a half century. These combined facts, which they knew, and the law, which they were presumed to know, when taken and considered together, issued from this conjunction and interaction of law, fact, and construction of documents as another fact. *Snell's Equity* (15th Ed.), 433, 434; *Story's Eq. Juris.* (14th Ed.), secs. 166, 184. This fact was that the lease in question had determined; but the joint tenants, in the erroneous conviction that the lease was extant, procured an administration in order to acquire the leasehold estate; bought and paid for and received a grant of the term, which neither the joint tenants, the administrator, nor the orphans' court, would have done or united in doing, if all had not been animated by the common misapprehension that the legal estate in the lease was subsisting. This misconception is called by eminent authority a mistake of fact,

although by some regarded as one of law. It is justly observed by Pomeroy: 'A private legal right, title, estate, interest, duty or liability is always a very complex conception. It necessarily depends so much upon conditions of fact, that it is difficult, if not impossible, to form a distinct notion of a private legal right, interest or liability separated from the facts in which it is involved and upon which it depends. Mistakes, therefore, of a person with respect to his own legal rights and liabilities may be properly regarded—as in a great measure they really are— and may be dealt with as mistakes of fact. Courts have constantly felt and acted upon this view, though not always avowedly.' * * * It is not the less a representation of fact because the fact stated involves a conclusion of law, as pointed out by Sir George Jessel in *Eaglesfield v. Marquis of Londonderry*, L. R. 4 Ch. Div. 693, 702, 703; *Cooper v. Phibbs*, L. R. 2 H. L. 149, 170; *Story's Eq. Juris.* (14th Ed.), sec. 186."

See also *Baltimore & Susquehanna R.R. Co. v. Faunce*, 6 Gill 68, 77 ("A payment cannot well be said to be made voluntarily when it is made in consequence alone of a false view of the facts"); 3 Pomeroy, *A Treatise on Equity Jurisprudence*, §§ 849 a, 854 (5th ed. Symons 1941); *Restatement of Restitution* § 20 and Introductory Notes to Ch. 2 and to Topic 3 (Mistake of Law) at 179; *Poe's Pleading and Practice*, §§ 119-120A (6th ed. Sachs 1970).

We think that Chassagne's mistake as to his private rights and liabilities in permitting Debelius to receive $3,400 more than he should have is, in the words of the *Carolina Coach* case (p. 245 of 206 Md.):

"not a mistake of law, pure and simple, so as to bar a recovery of the overpayments, but as involving a mistaken view of the facts.

"That [the payor] had at hand the means of

116

discovering the error is not a bar to this suit. *Baltimore & Susquehanna R.R. Co. v. Faunce, supra; Restatement, Restitution,* Sec. 59.

"There is no suggestion that the payments were by way of compromise, so that there can be no bar for that reason."

*Judgment affirmed, with costs.*