**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1750

EXPO PROPERTIES, LLC; MERCHANTS PROPERTIES, LLC,

Plaintiffs - Appellants,

v.

EXPERIENT, INC.,

Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore. George L. Russell, III, District Judge. (1:14-cv-00688-GLR)

Argued: January 28, 2020					Decided: April 15, 2020

Before GREGORY, Chief Judge, WILKINSON and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Chief Judge Gregory and Judge Wilkinson joined.

**ARGUED:** Matthew John Connolly, NUTTER, MCCLENNEN & FISH, LLP, Boston, Massachusetts, for Appellants. Christine Pham, ROSENBERG MARTIN GREENBERG, LLP, Baltimore, Maryland, for Appellee. **ON BRIEF:** Michael A. Schlanger, SCHLANGER LITIGATION CONSULTING LLC, Washington, D.C., for Appellants. Gerard P. Martin, ROSENBERG MARTIN GREENBERG, LLP, Baltimore, Maryland, for Appellee.

WYNN, Circuit Judge:

Plaintiffs-Appellants Expo Properties and Merchants Properties own an office complex in Maryland, which they leased to Defendant-Appellee Experient. When the lease term ended, there were disputes over the condition the premises should be in when Defendant vacated, and who should pay for any work to put the premises into that condition. Some general provisions in the parties' lease suggested that all costs should go to Defendant, but other, specific, provisions outlined how costs should be shared.

In the ensuing litigation, Plaintiffs relied on an estoppel certificate from several years prior, signed by Defendant, that suggested a lease modification had occurred to conform the lease to Plaintiffs' reading. Plaintiffs argued that Defendant's liability stemmed from that lease modification. When both parties moved for partial summary judgment, the district court held that no lease modification had occurred. For the reasons that follow, we affirm the district court.

I.

At bottom, this case is about a Lease that covered an office building complex (the "Premises") in Frederick, Maryland. The origins of this Lease lie several decades ago with predecessors-in-interest to today's parties. While this case turns on unambiguous language found within the four corners of the Lease, the history of the Premises and the Lease is relevant to Plaintiffs' arguments.

In March 1994, original landlord John Laughlin leased the Premises to original tenant Galaxy Registration, Inc. The original Lease had a term of five years with a renewal option for another five years. As a commercial lease, it spanned thirty-one articles, with

2

subparts, including some articles that used general language to obligate the tenant to cover large categories of expenses, but also some articles with tailored cost-sharing provisions. Later that month, landlord Laughlin and tenant Galaxy executed an amendment to the Lease, which concerned the construction of a 25,700 square foot addition to the Premises. This amendment was signed by both Laughlin and Galaxy.[1] In April 1997, a Second Amendment—also signed by both Laughlin and Galaxy—adjusted the rent. Both amendments also adjusted the term of the Lease.

In May 1998, landlord Laughlin wrote a letter (the "1998 Letter") to tenant Galaxy. The 1998 Letter concerned the terms of the Lease and arose from a dispute over who would pay for a new fire protection system. According to the 1998 Letter, Galaxy had told Laughlin that Galaxy was not responsible under the Lease for any costs associated with work done on building infrastructure. Laughlin wrote the 1998 letter to "point out" that this was not what the Lease said. J.A. 377. The 1998 Letter states, in relevant part, "our lease makes it clear that all costs for repairs, maintenance, and capital improvements will be borne by [the tenant] as they had been in the past when I owned both the company and the building." J.A. 377. In support, Laughlin only cited Article 4 (D) of the Lease. Article 4 (D) and its subparts related to "Additional Rent Payments." J.A. 334-36. The 1998 Letter was signed by landlord Laughlin only.

---

[1] Over the life of the Lease, there would be four more amendments, all bearing the title "Amendment," and all signed by landlord and tenant together. There is no dispute that these five amendments modified the Lease.

3

In 2002, the parties executed a Third Amendment to renew the Lease for an additional five-year term. This Third Amendment also noted that Galaxy had become Expo Exchange, LLC. The name change was on account of a change in ownership structure. Tenant Expo Exchange is not to be confused with Plaintiff-landlord Expo Properties.

In 2004, original landlord Laughlin transferred his interest in the Lease to Expo Properties, LLC—one of the Plaintiffs in this case. Landlord Expo Properties and tenant Expo Exchange executed a Fourth Amendment in 2005 wherein the tenant leased more space that had been constructed. The Fourth Amendment specified that the additional space, totaling approximately 11,150 square feet, would be rented on a "Triple Net" basis. J.A. 369. This is the first and only time "net lease" language appears in either the Lease or the five uncontested amendments.

In 2006, Merchants Properties, the second Plaintiff in this case, acquired all membership interests in landlord Expo Properties. In the course of the acquisition, tenant Expo Exchange signed an Estoppel Certificate for Merchants Properties.[2] Merchants Properties needed this Estoppel Certificate because it was securing a loan to finance the purchase, and receipt of the Estoppel Certificate was a condition of the loan. Tenant Expo

---

[2] An estoppel certificate is:

> A signed statement by a party (such as a tenant or a mortgagee) certifying for another's benefit that certain facts are correct, such as that a lease exists, that there are no defaults, and that rent is paid to a certain date. A party's delivery of this statement estops that party from later claiming a different set of facts.

*Estoppel Certificate*, *Black's Law Dictionary* (10th ed. 2014).

Exchange executed the Estoppel Certificate because Article 26 of the Lease required it to do so. Article 26 specified that if the Lease had been modified, an estoppel certificate would state the way in which it was modified and include a copy of the modification agreement.

On its first page, the Estoppel Certificate recited that the original Lease had been "modified and amended" by a list of instruments, including, without elaboration, the "[l]etter dated May 1, 1998 from John R. Laughlin to Mr. Michael Goodwin, President and CEO of Galaxy . . . ." J.A. 373. Another provision in the Estoppel Certificate stated that Articles 4 D(2), 4 D(3), and 8 were "clarified" by the 1998 Letter, and that "Tenant acknowledges that all repairs . . . are the responsibility of Tenant . . . ." J.A. 375. In this same provision, the Estoppel Certificate quoted Article 8 of the Lease "in pertinent part." J.A. 375. It did not specify that any of the language of Article 8—or the language of any other article—had been modified or deleted.

After the issuance of the Estoppel Certificate, Defendant Experient became successor in interest to tenant Expo Exchange. This created the present alignment of parties: Plaintiffs Expo Properties and Merchants Properties as landlords, and Defendant Experient as tenant.

In 2011, the parties executed a Fifth Amendment to extend the Lease to July 2013. This Fifth Amendment, in its recitals, defined "the existing Lease" as "the LEASE

5

AGREEMENT executed between [the parties] on March 17, 1994; its Four subsequent Amendments . . . and the Estoppel Certificate dated July 18, 2006." J.A. 384.[3]

The instant dispute began in 2012 when Defendant was preparing to vacate the premises. In June 2012, Expo Properties requested that Defendant provide inspection reports for the roof of the building, as well as the heating, ventilation, and air conditioning ("HVAC") systems. In January 2013, Defendant sent summary reports to Expo Properties. Expo Properties responded later that month with a letter that told Defendant to make the repairs recommended in the summaries. The letter also notified Defendant that Expo Properties would send its own inspectors and Expo Properties expected Defendant to make any additional repairs or replacements that the new inspectors identified. This letter supported the repair and replacements demand with reference to the Fifth Amendment to the Lease, the Estoppel Certificate, and the 1998 Letter. It characterized the Estoppel Certificate and 1998 Letter as amendments to the Lease.

Subsequently, Expo Properties' inspectors, KCI Technologies, Inc., prepared a detailed assessment of the Premises, dated May 30, 2013. That same day, Expo Properties sent the KCI assessment to Defendant with an email reiterating that "all of the work identified in . . . the KCI report should be performed by [Defendant] before the expiration

---

[3] Before the district court, Plaintiffs argued that this paragraph of the Fifth Amendment expressly incorporated the Estoppel Certificate into the Lease. The district court held it did not because recitals are not an operative part of an agreement. *Expo Properties, LLC v. Experient, Inc*, No. GLR-14-688, 2016 WL 3997290, at *8 (D. Md. July 26, 2016); *see Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113, 127 (4th Cir. 2019) ("Maryland law recognizes the general principle that . . . recitals are not binding . . . ."). Plaintiffs have not renewed this argument on appeal.

of the Lease term." J.A. 139. Defendant did not perform the requested work. After Defendant vacated on schedule in July 2013, Plaintiffs sued in the District Court of Maryland for breach of contract, promissory estoppel, negligence, and declaratory relief.[4]

In September 2015, Defendant moved for partial summary judgment. Defendant's claims from that motion that are relevant to this appeal are: (1) neither the 1998 Letter nor the Estoppel Certificate amended the Lease; (2) Defendant was not obligated to replace HVAC units and carpeting; and (3) Defendant was not obligated to pay for structural repairs that Plaintiffs had not made and charged costs for as additional rent during the Lease term.[5] Plaintiffs responded with a cross-motion for partial summary judgment. Plaintiffs sought a declaratory judgment that, relevantly: (1) the Estoppel Certificate had amended the Lease; (2) Defendant was required to pay for all repairs to the Premises; and (3) Defendant was required to return the Premises in the same good order and original condition in which Defendant and its predecessors received them.

At the heart of these claims were Article 8 of the Lease, which had a cost-sharing provision for structural repairs, and Article 24, which had an "ordinary wear" surrender clause exception. The Article 8 provision was relevant for Defendant's claims (1) and (3) and Plaintiffs' claims (1) and (2). Plaintiffs took the position that the Lease bound the tenant to a sweeping obligation to pay for any and all costs related to the building in every instance—entirely contrary to any sort of cost-sharing under Article 8. Therefore, Plaintiffs

---

[4] In the ligation before the district court, the negligence claim was dismissed.

[5] Defendant also moved for summary judgment that it was not obligated to remove interior walls and that Plaintiffs were not entitled to holdover rent. The district court did not grant summary judgment on these issues and they are not relevant to this appeal.

7

pursued the theory that the Estoppel Certificate and the 1998 Letter amended the Lease to eliminate the Article 8 cost-sharing provision, as well as any other cost-sharing language in the Lease. Article 24's ordinary wear provision is relevant to Defendant's claim (3) and all of Plaintiffs' claims. The issue was whether the "ordinary wear" exception applied to the return or replacement of the HVAC units and carpets.

The district court granted full or partial summary judgment to Defendant on the claims relevant to this appeal. First, the district court held that neither the Estoppel Certificate nor the 1998 Letter amended the Lease. For the HVAC units, the district court held that the Lease required Defendant to pay for repairs and to return the Premises in the same good order and condition which Defendant received them, except for ordinary wear. Because Plaintiffs contended that the Lease required Defendant to replace HVAC units that were installed when the building was constructed and to replace original thermostats with programmable thermostats, the district court determined that Plaintiffs were actually asking for upgrades—which the Lease did not require Defendant to perform. While the same "ordinary wear" exception applied to carpets as to HVAC units, because the Lease had a separate provision for carpets that created a dispute of material fact, the district court granted in part and denied in part Defendant's motion as to carpeting. Finally, as to the roof and other structural repairs, the district court held that Article 8 of the Lease required the landlord to exercise its option to enter the Premises and make necessary structural repairs during the term of the Lease in order to charge costs to the tenant as additional rent; because the Lease had expired, Plaintiffs could no longer pass costs to Defendant. Accordingly, the district court granted Defendant's motion as to structural repairs.

8

This treatment of Defendant's motion necessarily meant that the district court denied Plaintiffs' converse claims: the Estoppel Certificate did not amend the Lease, Defendant was not required to pay for *all* costs associated with the building, and Defendant's obligation to return the Premises in the same good order and condition in which they were received was subject to an ordinary wear exception.

Following the district court's decision, Plaintiffs gave notice of appeal. Shortly thereafter, the parties stipulated to dismissal with prejudice of all remaining claims before the district court. This included dismissal of the carpet claim.

## II.

This Court reviews a grant of summary judgment de novo. *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). The review consists of whether there are any genuine issues of material fact, or whether the district court erred in applying the substantive law. *Id.* This Court views the evidence in the light most favorable to the nonmoving party. *Id.*

## III.

Plaintiffs direct our attention to three purported errors of the district court. Plaintiffs allege that the district court erred (1) by rejecting the proposition that estoppel certificates are legally binding; (2) by not interpreting the lease to give effect to its "net lease" nature; and (3) by ruling inadmissible course of performance evidence that the parties treated the lease as a net lease and that the parties treated the Estoppel Certificate as legally binding.

Generally, Plaintiffs would like the Estoppel Certificate to control this case—either as a contract amendment in the traditional sense, or as a clarification of an ambiguity in the original Lease, or as a special legal document in a class of its own. Thus, instead of

9

challenging the district court's decision piece-by-piece, Plaintiffs advocate for a sweepingly different interpretation of the Lease.

But after conducting a de novo analysis of the Defendant's obligations under the Lease, we find no error in the district court's decision. Not only was the district court correct that the Estoppel Certificate in this case did not alter obligations under the Lease, but it was also correct that the Lease was unambiguous regarding the disputed items and therefore properly held that Plaintiffs' parol evidence was inadmissible.

A.

We begin with the question of whether either the 1998 Letter or the Estoppel Certificate modified the Lease. Plaintiffs characterized these documents as lease modifications because, in their theory of this case, the 1998 Letter and the Estoppel Certificate restructured the Lease by eliminating any and all cost-sharing provisions and language, thereby making the tenant solely responsible for all building costs. Because neither document evinces mutual assent to modify the Lease, we hold that neither document modified the cost-sharing provisions in the Lease.

The Lease contained a choice-of-law provision specifying Maryland law, and the parties do not dispute that Maryland law applies. Under Maryland law, to modify a contract, "there must be mutual assent." *L & L Corp. v. Ammendale Normal Inst.*, 236 A.2d 734, 736 (Md. 1968). Manifestation of mutual assent includes two issues: "(1) intent to be bound, and (2) definiteness of terms." *Cochran v. Norkunas*, 919 A.2d 700, 708 (Md. 2007). There are many factors that may be relevant to determining mutual assent, "but the most important factor is the language of the agreement." *Id.* at 709. Turning to the language

10

of the agreement, Maryland uses the "law of the objective interpretation of contracts." *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999). Thus, "[the] search to determine the meaning of a contract is focused on the four corners of the agreement." *Cochran*, 919 A.2d at 710.

Starting with the Estoppel Certificate, like the district court, we find it significant that the Estoppel Certificate was signed by one party only. This, despite an integration clause in the Lease that required amendments to be signed by both landlord and tenant. In contrast, the five uncontested amendments to the Lease were signed by both parties. So, within the four corners of the relevant documents, there is no evidence of intent to be bound. Furthermore, as the district court noted, the Estoppel Certificate does not label itself as an amendment to the Lease. It also does not describe how it modifies any obligation under the Lease. It neither inserts language nor deletes language. Nowhere does it state that it eliminates any cost-sharing provisions of the Lease. While it quotes Article 8 (which related to disputed structural repairs) "in pertinent part" and does not quote the cost-sharing portion of that section, a quotation "in pertinent part" is not equivalent to an intentional deletion of language not quoted. J.A. 375. Thus, the Estoppel Certificate also lacks definiteness of terms.

The 1998 Letter has the same shortcomings as the Estoppel Certificate: it is signed by only one party and does not specify how it would modify the Lease. Furthermore, the 1998 Letter does not mention Article 8. Accordingly, because they lack mutual assent, neither the Estoppel Certificate nor the 1998 Letter modified the Lease.

11

On appeal, Plaintiffs contend that mutual assent was irrelevant to the analysis here because requiring mutual assent "misses the whole point of an estoppel certificate, not just the estoppel certificate in this case, but every estoppel in every case in every state going back decades." Appellants' Br. at 40. This is not correct. *See, e.g.*, *Pocatello Hosp., LLC v. Quail Ridge Med. Inv'r, LLC*, 330 P.3d 1067, 1074 (Idaho 2014) ("[I]f an estoppel certificate does not explicitly modify the terms of the lease, it is not a mechanism by which a lease agreement may be modified."). Just as every lease is different, every estoppel certificate is also different. Moreover, there is no national law of estoppel certificates. *See HRC Guam Co. v. Bayview II LLC*, 2017 Guam 25 ¶¶ 39-43 (discussing state-by-state variation in enforcement of estoppel certificates).

But there is state contract law. This Estoppel Certificate did not satisfy the requirements of Maryland contract law for modification of a contract. Therefore, it did not modify the Lease under Maryland law.[6]

---

[6] Plaintiffs also argue that because Defendant executed the Estoppel Certificate for the benefit of the parties involved in Merchant Properties' purchase of Expo Properties, Defendant gave consideration that rendered a promise contained in the Estoppel Certificate enforceable against Defendant. Plaintiffs suggest that so long as both a promise and consideration exist among a group of parties, the promise is enforceable as a contract. Plaintiffs cite the commentary to § 71 of the Restatement (Second) of Contracts for support. That section states, "It matters not from whom the consideration moves or to whom it goes. If it is bargained for and *given in exchange* for the promise, the promise is not gratuitous." Restatement (Second) of Contracts, § 71 cmt. e (Am. Law Inst. 1981) (emphasis added). That statement is distinguishable from Plaintiffs' contention because, here, Plaintiffs want to enforce a purported promise made by the same party who gave the consideration, rather than a promise made to the party that gave the consideration.

We further note that Plaintiffs have gestured towards, but not expanded, a theory of promissory estoppel. Under Maryland law, promissory estoppel has four elements, one of which is "a clear and definite promise." *Pavel Enters., Inc. v. A.S. Johnson Co., Inc.*, 674

12

B.

In the alternative, Plaintiffs argue that the 1998 Letter and the Estoppel Certificate, as well as course-of-performance evidence and trade-usage evidence, clarified an ambiguity in the Lease, and in that way eliminated any cost-sharing. Plaintiffs' proposed ambiguity is that the Lease obligated Defendant to pay "100 percent of the cost of all maintenance and repairs (including structural repairs), no matter what the amount was, and no matter whether the cost was characterized as an expense or a capital improvement," but this was inconsistent with the cost-sharing provisions contained in Articles 6 and 8 of the Lease. Appellants' Br. at 43. In effect, Plaintiffs present a circular argument that the Lease is ambiguous because it says something contrary to their litigation position. The district court held that the Lease unambiguously does *not* allocate all costs for all maintenance and repairs, no matter what, to the tenant. We agree. Accordingly, Plaintiffs' parol evidence is inadmissible on this point.

Maryland follows the "law of the objective interpretation of contracts." *Calomiris*, 727 A.2d at 363. "[A] written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Id.* A determination of ambiguity includes consideration of "the character of the contract, its purpose, and the facts and

A.2d 521, 532 (Md. 1996). The district court found that the Estoppel Certificate "makes no promises." *Expo Properties*, 2016 WL 3997290, at *8. As Plaintiffs did not develop— either here or before the district court—their contention that this Estoppel Certificate, an instrument which traditionally makes representations of fact, contained a promise, we do not consider this issue. *See Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 152 n.4 (4th Cir. 2012) (party that mentioned argument in a header but did not develop that argument waived it).

13

circumstances of the parties at the time of execution." *Id.* (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985)). "[T]he clear and unambiguous language of an agreement will not give []way to what the parties thought that the agreement meant or intended to mean." *Id.* (quoting *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985)). Therefore, a court may consider the context of a transaction or the custom of the trade, but may not consider intentions and negotiations of the parties. *Id.* "[O]nly where there is an ambiguity in the contract is the conduct of the parties available as practical construction of its meaning." *Walker v. Associated Dry Goods Corp.*, 189 A.2d 91, 97 (Md. 1963). "[W]hen the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." *Gen. Motors Acceptance Corp.*, 492 A.2d at 1310.

The Lease contains cost-sharing provisions for specific items. The parties plainly and unambiguously expressed that they meant to share certain costs. Article 8 of the Lease addresses repairs, including structural repairs (such as roof work), providing in relevant part:

> Tenant shall be responsible to make all necessary repairs during the term . . . to the roof . . . [,] the exterior walls, foundations, sidewalks, parking lots, and driveways, and Tenant agrees that Landlord is under no obligation to perform any repairs and/or maintenance with respect to the Leased Premises. . . . [Landlord] shall have . . . [the] right . . . to enter . . . [and] to make such reasonable structural repairs and maintenance . . . as the Landlord may deem necessary or proper. The cost of all structural repairs and maintenance, whether performed by the Tenant or Landlord, shall be borne by the Tenant as additional rent hereunder, except in those instances where (i) the structural repair or maintenance is not made necessary in whole or in part as a result of Tenant's negligence, (ii) the cost of an item of structural repair or maintenance is Five Thousand Dollars ($5,000.00) or more, and (iii) the actual economic life of such structural repairs or maintenance is in excess of

14

the term of the Lease then in effect, in which case one half (1/2) of the cost thereof shall be paid by the Tenant as additional rent hereunder and one half (1/2) of the cost thereof shall be paid by the Landlord.

J.A. 341-42.

Thus, with respect to the roof and other structural items, the tenant is responsible for making necessary repairs during the term of the Lease, although the landlord has a right to enter the Premises and make repairs the landlord deems necessary. Except in the enumerated circumstances, the tenant bears the costs for the necessary repairs made by either the tenant or the landlord, paying them "as additional rent." In the enumerated circumstances, however, the tenant and landlord split the costs evenly.

Considering the character of this contract—a renewable commercial lease with a five-year term—there is nothing out of the ordinary about Article 8. Where the tenant caused a problem by its negligence, the tenant pays. Otherwise, for expensive work that will benefit the landlord even after the tenant leaves, the landlord must pay some of the cost. Moreover, the structure of the provision conditions the tenant's cost-burden on a repair having been made, which limits the tenant's obligation to repairs from which the tenant will benefit during the tenancy. Thus, looking to the context of the transaction, Article 8 is a reasonable Lease provision as drafted.

Nevertheless, Plaintiffs point to other Lease sections which they contend conflict with Article 8's cost-sharing provision and render the Lease ambiguous. Specifically, Plaintiffs claim that Article 8 was internally ambiguous by making the tenant responsible for all necessary repairs but then including a cost-splitting provision, and that Article 8 is

15

inconsistent with Articles 2, 4, and 6, which all contain sections broadly allocating costs to the tenant.

But Article 8 is not inconsistent with itself, or with other provisions in the Lease. Article 8 starts by allocating costs to the tenant. It then says, "except in those instances," and proceeds to set out the instances in which the tenant and landlord will share costs. The cost-sharing provision here is a cogent and specific exception to a general rule.

Article 2 of the Lease concerns the landlord's delivery of the Premises in "as is" condition, condition of improvements, and tenant's fixturization. J.A. 332. It provides that the landlord "shall not be responsible to perform any work with respect to the [Premises], it being expressly understood that any work, special installations, and other fit-ups shall be carried out by the Tenant at Tenant's sole cost and expense in accordance with Plans . . . that are subject to the prior written approval of the Landlord." J.A. 332-33. The section goes on to forbid mechanics' liens that affect the Landlord's interest in the Premises, and to state that the Landlord has made no promises to remodel the Premises. In sum, this part of the Lease limits the landlord's obligations with respect to the delivery and upgrade of the Premises. It does not conflict with the structural repairs cost-sharing of Article 8.

Article 4 of the Lease relates to the tenant's rental covenants, and it contains many subsections. Plaintiffs focus their arguments on Article 4 (D)(2) and Article 4 (D)(3). Article 4 (D)(2) of the Lease provides in relevant part:

> Tenant agrees to pay the costs and expenses paid or incurred by or on behalf of Landlord for managing, operating, maintaining and repairing the Leased Premises, including, without limitation, the cost of . . . maintenance and repair and replacement of utility systems, . . . except as hereinafter provided.

16

J.A. 334-35.

Article 4 (D)(2) does not conflict with Article 8. Again, Article 8 starts with the proposition that the tenant bears costs for repairs made, but then states that in specified circumstances the costs will be split. The Article 4 (D)(2) language that the tenant agrees to pay costs mirrors Article 8's starting proposition. To the extent Article 4 (D)(2) and Article 8 both address maintenance and repair of the Premises, the specific exception to the general rule—that is, the cost-sharing provision of Article 8—is unambiguous.

Nor is there any inconsistency between Article 4 (D)(3) and Article 8. Article 4 (D)(3) allocates to the tenant the costs of capital improvements that are intended to reduce "Landlord expenses" as well as capital improvements that are required by law. J.A. 335. For more expensive improvements that are not required by law, the landlord must seek the tenant's prior written approval, which is not to be unreasonably withheld. "Landlord expenses" is not a defined term in the Lease, but Article 4 (D)(2), immediately preceding, obligates the tenant to pay "expenses paid . . . by . . . [the] Landlord." J.A. 334. Thus, one effect of Article 4 (D)(3) is to require the tenant to pay for some capital improvements when those capital improvements benefit the tenant by reducing its obligation to cover landlord expenses. Where the landlord's proposal is unreasonable, the tenant may refuse. Plaintiffs have not made any argument how Article 4 (D)(3), specifically, conflicts with other provisions of the Lease, except that it evinces a general theme that the Lease allocates most costs to the tenant. As explained above, the Article 8 cost-sharing provision is a specific and unambiguous exception to any general cost allocations and is therefore not inconsistent with Article 4 (D)(3).

17

Finally, Plaintiffs point to Article 6 (C) and (L). Article 6 (C) provides:

> Tenant shall keep at its own expense (except as otherwise provided hereinbelow) the exterior and interior of the Leased Premises, together with all windows and glass, . . . heating, [and] air conditioning . . . in good order and condition and surrender the same at the Lease Expiration Date in the same good order in which they are received. . . Landlord agrees that in the event that a repair or replacement (i) is not made necessary in whole or in part as a result of Tenant's negligence, (ii) is Five Thousand Dollars ($5,000.00) or more in amount, and (iii) has an actual economic life in excess of the term of the Lease then in effect, the Landlord shall be responsible for one-half (1/2) of the cost of such repair or replacement and the Tenant shall be responsible for one-half (1/2) of the cost of such repair or replacement.

J.A. 338.

As with Article 8, Article 6 (C) starts with a general statement about the tenant's responsibility for costs, but then contains a cost-sharing provision that is a specific exception. Article 6 (C) makes the status of the cost-sharing provision as an exception explicit by stating "except as otherwise provided hereinbelow." J.A. 338. Thus, Article 6 (C) is not internally inconsistent, nor is it inconsistent with Articles 2, 4, or 8, for the same reasons that Article 8 is not inconsistent with those Lease sections.

Article 6 (L) addresses alterations to the Premises. It too has general language about the tenant's responsibility for "interior repairs, replacements, fixtures, and decorations." J.A. 340. Again, such general language is not inconsistent with the Article 8 cost-sharing provision.

18

As the cost-sharing provisions of the Lease are not ambiguous, we do not consider parol evidence such as course-of-performance evidence. We also do not resort to the Estoppel Certificate or the 1998 Letter to resolve an ambiguity, as no ambiguity exists.[7]

C.

Having addressed which documents constitute the Lease and whether the Lease is ambiguous as to cost-sharing, we now turn to structural repairs and HVAC units.

1.

The district court granted Defendant's motion for summary judgment as to the roof and other structural repairs. As discussed above, Article 8 governs these items, and Article 8 is unambiguous. A repair must be made during the term of the Lease in order to be charged to the tenant, and some repairs may fall into the cost-sharing provision exception which obligates the landlord to split the cost with the tenant. The Landlord has a right to enter the Premises and make repairs that the Landlord deems necessary, which the landlord may then charge to the tenant, but the landlord must exercise this right, including actually making the repairs, in order to pass on the cost for a repair. The Landlord having not made repairs during the term of the Lease, Defendant is not obligated to pay Plaintiffs' structural

---

[7] With respect to Plaintiffs' trade-usage-evidence argument, Plaintiffs contend that the district court erred by not examining "commercial realities," as evidenced by its failure to cite, among other non-binding authorities, dictionaries. Appellants' Br. at 47-48. Plaintiffs suggest that if the district court had examined the definition of "net lease," it would have found the Lease ambiguous. There is no obligation for a district court to cite a dictionary when ruling on a motion for summary judgment—especially where a purportedly disputed term, "net lease," does not appear in the original Lease. Plaintiffs' attack on the district court's citations is without merit.

19

costs, which Plaintiffs first demanded only two months before the Lease expired. We affirm the district court on this issue.

2.

The district court also granted Defendant's motion for summary judgment as to the HVAC units. The issue was the condition of the Premises upon surrender. The district court found that Article 6 (C) and Article 24 of the Lease both related to surrender. Article 6 (C), quoted at length above, concerned "heating, air conditioning and other mechanical equipment" and generally obligated the tenant to surrender them "in the same good order in which they are received." J.A. 338. Then, Article 24 obligated the tenant to "return the [Premises] . . . in as good condition as when Tenant originally took possession, ordinary wear . . . and damage resulting from the act of Landlord . . . excepted." J.A. 352. Under Maryland law, if "one [contract provision] is general in character and the other is specific, the specific stipulation will take precedence over the general, and control it." *Heist v. E. Sav. Bank, FSB*, 884 A.2d 1224, 1228 (Md. Ct. Spec. App. 2005) (quoting *Fed. Ins. Co. v. Allstate Ins. Co.*, 341 A.2d 399, 407 (Md. 1975)). The district court ably applied this rule to the Lease. Article 24 was the more specific provision with respect to the return of the Premises. Therefore, Defendant was required to return the Premises in the same good order and original condition in which they were received, except for ordinary wear. The district court correctly held that the contested HVAC work, specifically replacement of HVAC units and replacement of original thermostats with programmable thermostats, constituted "upgrades" not required under the Lease. J.A. 1007.

20

Plaintiffs argue that an ordinary-wear exception does not relieve a tenant of repair or replacement obligations. The truth of that proposition will depend on lease provisions in every case. For example, Plaintiffs rely entirely on a case from the Northern District of Illinois, where the court applied Illinois contract law to a lease with a provision that obligated the tenant to undertake replacements of disputed items "whether ordinary or extraordinary." *Schultz Bros. Co. v. Osram Sylvania Prods., Inc.*, No. 10 C 2995, 2011 WL 4585237, at *2 (N.D. Ill. Sept. 30, 2011). This Lease lacks such an "ordinary or extraordinary" clause. Moreover, on appeal, Plaintiffs have not presented an argument for why replacing HVAC equipment with the newest model does not constitute an "upgrade" outside the scope of the Lease. Accordingly, we affirm the district court as to the HVAC units.

## IV.

Plaintiffs sued to enforce promises that the Defendant never made. For the reasons above, the district court properly granted summary judgment to the Defendant.

*AFFIRMED*